53 P.3d 979 (2002)
147 Wash.2d 259
In the Matter of the DETENTION OF C.W., Petitioner.
In the Matter of the Detention of B.B., Petitioner.
In the Matter of the Detention of E.S., Petitioner.
In the Matter of the Detention of D.M., Petitioner.
In the Matter of the Detention of T.B., Petitioner.
In the Matter of the Detention of R.F., Petitioner.
No. 71311-1.
Supreme Court of Washington, En Banc.
Argued February 14, 2002.
Decided September 12, 2002.
*980 Public Defender Ass'n, Richard Lichtenstadter, Seattle, for Petitioner.
Norm Maleng, King County Prosecutor, Gerald Smith, Deputy, Seattle, for Respondent.
BRIDGE, J.
Six petitioners, C.W., B.B., E.S., D.M., T.B., and R.F., were taken to a local hospital after they were either found by the police or a complaint was made to the police because of their strange and/or violent behavior. After evaluating petitioners, the hospital professional staff contacted the County Designated Mental Health Professional (CDMHP) pursuant to RCW 71.05.050. A CDMHP detained each petitioner for 72-hour evaluation and treatment. The State then petitioned for further involuntary detention. In each case, the superior court commissioner dismissed the petition for further detention, ruling that the State had violated the six-hour time limit in RCW 71.05.050. The State appealed and the Court of Appeals reversed.
We hold that RCW 71.05.050 permits a hospital to detain an alleged mentally ill person for six hours from the time the hospital professional staff determines that it is necessary to contact a CDMHP. We further hold that due process considerations limit the amount of time hospital professional staff have to evaluate a person before referring that person to a CDMHP. Finally, we hold that dismissal will not usually be the appropriate remedy for violations of RCW 71.05.050.

I
The facts and procedural history of each of these cases is as follows:
C.W.Seattle police officers took C.W. to the emergency department (ED) of Harborview Medical Center (Harborview) on March 28, 1999 after he was found disturbing others outside a coffeehouse. When the officers arrived at the coffeehouse, they found a citizen holding C.W. down. Once he was released, C.W. began flailing and thrashing his arms around and yelling. The police were again forced to restrain him. C.W. was admitted to Harbor-view's crisis triage unit *981 (CTU) at 9:20 a.m. and was placed in restraints shortly thereafter.
At 10:30 a.m., a little more than one hour later, C.W. was evaluated by a social worker. He was diagnosed as suffering from psychosis NOS. At 12:20 p.m., the social worker referred C.W. to the CDMHP. At 4:10 p.m., less than seven hours since admission, the CDMHP detained C.W. for 72 hours of evaluation and treatment pursuant to RCW 71.05.150(2).
On March 31, 1999, the State filed a petition in King County Superior Court for 14-day involuntary treatment, and a proceeding was held before a mental health commissioner. C.W. filed a motion to dismiss the petition, arguing that RCW 71.05.050 had been violated because he was detained by ED staff for more than six hours prior to his detention by the CDMHP. The commissioner dismissed the petition for 14-day involuntary treatment, ruling that the six-hour period began to run when C.W. was admitted into the ED. Thus, the State had violated RCW 71.05.050. The State filed a motion for revision of the decision, and Superior Court Judge Ronald Kessler denied the motion and dismissed the matter with prejudice on April 23, 1999. The State appealed.
B.B.B.B. was taken to the Harborview ED on July 2, 1999 after he was found by Seattle police on a street corner, disheveled and smelling of urine. He was admitted to the CTU at 5:50 p.m. B.B. was placed in four-point restraints about 20 minutes later, after punching a nurse in the arm and stating, "`I could have killed you if I wanted.'"[1] A social worker interviewed B.B. at 6:16 p.m. During the interview B.B. made several threatening comments, including "`If you can't help me I'm gonna kill you ... Bitch, you're gonna die.'"[2] B.B. also told the social worker that nothing was bothering him and he wanted to go home.
It is unclear from the record when the ED social worker contacted the CDMHP. However, B.B. was detained by the CDMHP pursuant to RCW 71.05.150(2) at 11:58 p.m., 6 hours and 8 minutes after admission, and transported to West Seattle Psychiatric Hospital for up to 72 hours of evaluation and treatment.
The State filed a petition for 14-day involuntary treatment in King County Superior Court, and a proceeding was held before a mental health commissioner on July 7, 1999. B.B. filed a motion to dismiss the petition, arguing that RCW 71.05.050 violated due process because it allowed professional staff to detain a person for an indefinite period of time prior to referring the person to a CDMHP. The commissioner dismissed the petition for 14-day involuntary treatment, ruling that B.B. had been at the ED involuntarily and, because there was no "medical issue," the six-hour time period in RCW 71.05.050 had begun to run when B.B. was admitted to the ED. Therefore, he had been detained eight minutes longer than was allowed by the statute. The State appealed.
T.B.The Auburn police brought T.B. to the Valley Medical Center ED on June 27, 1999 after she had been physically and verbally abusive to her daughter. Her daughter stated that T.B. had not been taking her mediations. T.B. arrived at the ED at 10:53 p.m. T.B. was examined at 11:10 p.m. by a doctor with Northwest Mental Health and by a case manager. She was diagnosed with bipolar affective disorder with an "exacerbation of mania."[3]
T.B. was then seen by a hospital social worker at 12:30 a.m. on June 28, 1999. The social worker did a thorough examination of T.B., including interviewing T.B.'s daughter and brother. The case manager also questioned T.B. about what her "safety plan" would be if she went home.[4] A toxicology screen was ordered at 2:21 a.m. after T.B. stated that she had used marijuana that day. The lab result notification, which was generated at 3:04 a.m., showed that T.B. was positive for canibinoids. When T.B. became agitated and lunged at the case manager, the social worker made the referral to the CDMHP at 3:30 a.m. T.B. was detained by *982 the CDMHP at 6:45 a.m., approximately 8 hours after admission, and transported to Harborview for up to 72 hours of evaluation and treatment pursuant to RCW 71.05.150(2).
The State filed a petition for 14-day involuntary treatment in King County Superior Court on June 29, 1999, and a proceeding was held before a mental health commissioner on June 30, 1999. T.B. filed a motion to dismiss the petition, arguing that RCW 71.05.050 had been violated because she was detained by ED staff for more than six hours prior to her detention by the CDMHP. The commissioner dismissed the petition for 14-day involuntary treatment. The commissioner concluded that it was clear when T.B. was brought into the ED at 11:00 p.m. that she suffered from a mental illness and that there were no medical conditions. Therefore, the six-hour time period in RCW 71.05.050 began to run when she was brought in. The State appealed.
D.M.D.M. was taken by ambulance to the Harborview ED at 11:59 p.m. on September 1, 1999. The Bothell police had found D.M. sitting in a running car with a hose attached to the exhaust pipe leading to one of the car windows. His initial examination indicated that he suffered from carbon monoxide poisoning and had suicidal ideation. He was transferred to Virginia Mason's hyperbaric chamber for treatment for carbon monoxide poisoning. He returned from Virginia Mason at 6:45 a.m. on September 2, 1999 and the social worker's notes indicate that the attending physician would let her know when he was medically cleared. Although he was subsequently medically cleared for a psychiatric evaluation, the time was not recorded by the attending physician.
D.M. was transferred to the CTU at 10:50 a.m. He was interviewed by a hospital social worker at 2:30 p.m. Although the record is unclear, there is a notation indicating that D.M. was given medication for heroin withdrawal at around 2:45 p.m. The social worker referred D.M. to the CDMHP at 3:00 p.m. The CDMHP detained D.M. at 6:40 p.m. on September 2, 1999, and he was admitted to Harborview for up to 72 hours evaluation and treatment pursuant to RCW 71.05.150(2).
The State filed a petition for 14-day involuntary treatment in King County Superior Court, and a proceeding was held before a mental health commissioner on September 7, 1999. D.M. filed a motion to dismiss the petition, arguing that RCW 71.05.050 had been violated because he was detained by ED staff for more than six hours prior to his detention by the CDMHP and, in the alternative, that RCW 71.05.050 violated due process. The commissioner dismissed the petition for 14-day involuntary treatment. The commissioner concluded that the six-hour time limitation in RCW 71.05.050 begins to run when the patient is medically cleared. Because it was unclear from the record when this had occurred in D.M.'s case, the State had failed to meet its burden of showing that D.M. was not detained in excess of six hours. The State appealed.
E.S.E.S. was sent to the Harborview ED by the Seattle police after his sister reported his strange and threatening behavior. She indicated that he had threatened her and placed a burning cigarette completely in his mouth. E.S.'s sister also told the CDMHP that E.S. had assaulted a housekeeper at the hotel where he was staying a few days earlier and had been acting strangely, including talking to himself, writing nonintelligible notes, wearing his clothing backwards, and giving his money away. His sister stated that E.S. had recently been released from Western State Hospital after a two-year stay. E.S. was admitted to the ED at 9:15 p.m. on October 14, 1999.
E.S. was evaluated by an ED social worker at 12:05 a.m. on October 15, 1999. He was diagnosed as suffering from paranoid schizophrenia. The social worker referred E.S. to the CDMHP at 1:10 a.m. He was detained by the CDMHP at 6:15 a.m., nine hours after admission, on October 15, 1999 and was transferred to the West Seattle Psychiatric Hospital pursuant to RCW 71.05.150(2) for up to 72 hours of evaluation and treatment.
The State filed a petition for 14-day involuntary treatment in King County Superior Court on October 18, 1999, and a proceeding was held before a mental health commissioner on October 19, 1999. E.S. filed a motion to dismiss the petition, arguing that *983 RCW 71.05.050 had been violated because he was detained by ED staff for more than six hours prior to his detention by the CDMHP. The commissioner dismissed the petition for 14-day involuntary treatment. The commissioner rejected the State's position that RCW 71.05.050 provided for an unlimited amount of time to evaluate a patient before it referred the patient to the CDMHP. He concluded that because E.S. suffered from no "medical issues," the six-hour time limit began to run at 12:05 a.m. when the social worker wrote out the case history. Therefore, because E.S. was not detained by the CDMHP until 6:15 a.m., the six-hour time limit had been violated. The State appealed.
R.F.R.F. was taken by ambulance to the Harborview ED on November, 28, 1999 after being found on the street, labile, and with signs of anxiety. He was admitted to the ED at 8:20 a.m. and evaluated by a hospital social worker at 10:30 a.m. R.F. presented as disorganized, labile, nonresponsive to questions and talked about needing witness protection.
The social worker learned from R.F.'s brother that R.F. had no history of inpatient psychiatric admissions. At 11:45 a.m., she received a call from R.F.'s mother in Oregon who stated that R.F. had been taking medication for depression. R.F.'s mother told the social worker that she was not aware of R.F. using any drugs except marijuana. Although the social worker requested a urinalysis, because the hospital does not involuntarily catheterize people, one could not be done unless R.F. urinated.
R.F.'s mother indicated that she was willing to take R.F. back to Oregon but was worried about his mental state. However, R.F. stated that he would not return to Oregon with his mother. In response to the social worker's questions regarding how R.F. would take care of himself, he stated, "`If I die, I die.'"[5] The social worker concluded that R.F. might need emergency hospitalization and stabilization because he seemed unable to care for his health and safety. She referred R.F. to the CDMHP at 12:55 p.m. The CDMHP detained R.F. at 5:55 p.m., just over nine hours after his admission, on November 28, 1999.
The State filed a petition for 14-day involuntary treatment in King County Superior Court, and a proceeding was held before a mental health commissioner on December 2, 1999. R.F. filed a motion to dismiss the petition, arguing that RCW 71.05.050 had been violated because he was detained by ED staff for more than six hours prior to his detention by the CDMHP. The commissioner dismissed the petition for 14-day involuntary treatment. The commissioner ruled that RCW 71.05.050 allows for no more than six hours from the time the hospital staff determine that an evaluation by the CDMHP is necessary, but that the statute did not provide the hospital with a basis to detain R.F. beyond the six-hour time limit. The commissioner did not, however, make a definitive ruling as to when the professional staff determined that a referral to the CDMHP was appropriate. The State appealed.
The six cases were consolidated on appeal.[6] Although the cases were technically moot because each of the petitioners had been released from involuntary confinement, the court addressed the merits since each involved "matters of continuing and substantial public interest."[7] The court held that the six-hour time limitation in RCW 71.05.050 commences when the "professional staff of a hospital or agency determines that a person brought to the [ED] fulfills the statutory criteria and that it is necessary for the CDMHP to evaluate that person."[8] The court, however, rejected the State's argument that the ED staff had an unlimited amount of time to evaluate and treat the person before making the determination that an evaluation by the CDMHP was necessary. Instead, the court imposed due process limitations on the time a person could be held by ED staff before being referred to the CDMHP.
*984 Applying this interpretation of RCW 71.05.050, the court found that in all six cases, the petitioners had been detained by the CDMHP within six hours from the time the professional staff determined that a referral to the CDMHP was necessary. However, the court held that the due process limitation on the time a person may be in a hospital or agency prior to being referred to a CDMHP had been violated in the D.M. and E.S. cases because the State had failed to provide a reasonable explanation for the delay in evaluating D.M. and E.S. Finally, in the two cases in which the court found a due process violation, it declined to determine the appropriate remedy. It therefore vacated those two orders of dismissal. We granted the petitioners' petition for review.[9]

II

Mootness
Although these cases are technically moot, we agree with the Court of Appeals that review is appropriate because the cases raise "`matters of continuing and substantial public interest.'" In re Cross, 99 Wash.2d 373, 377, 662 P.2d 828 (1983) (quoting Sorenson v. City of Bellingham, 80 Wash.2d 547, 558, 496 P.2d 512 (1972)). See also In re Det. of Swanson, 115 Wash.2d 21, 25, 804 P.2d 1 (1990) ("`"the need to clarify the statutory scheme governing civil commitment is a matter of continuing and substantial public interest"'") (quoting In re Det. of LaBelle, 107 Wash.2d 196, 200, 728 P.2d 138 (1986) (quoting Dunner v. McLaughlin, 100 Wash.2d 832, 838, 676 P.2d 444 (1984))).

RCW 71.05.050
RCW 71.05.050 provides the process in which a person, who may be suffering from a mental illness, can be taken to a hospital for observation and treatment and, if necessary, referred to a CDMHP for further treatment. It states in pertinent part:
[I]f a person is brought to the [ED] of a public or private agency or hospital for observation or treatment, the person refuses voluntary admission, and the professional staff of the public or private agency or hospital regard such person as presenting as a result of a mental disorder an imminent likelihood of serious harm, or as presenting an imminent danger because of grave disability, they may detain such person for sufficient time to notify the county designated mental health professional of such person's condition to enable the county designated mental health professional to authorize such person being further held in custody or transported to an evaluation treatment center pursuant to the conditions in this chapter, but which time shall be no more than six hours from the time the professional staff determine that an evaluation by the county designated mental health professional is necessary.

RCW 71.05.050 (emphasis added).
The petitioners first assert that the Court of Appeals erred in concluding that the six-hour time limit in RCW 71.05.050 did not begin until the professional staff of the hospital or agency determined that an evaluation by the CDMHP was necessary. They argue that RCW 71.05.050 allows professional staff to "detain" a person who refuses voluntary admission only if they first "believe" that the person is "imminently dangerous or imminently gravely disabled as a result of a mental disorder." Pet. for Review at 7. They contend that the six-hour period begins when a person is detained by the professional staff.
The State responds that RCW 71.05.050 is unambiguous and, under the plain meaning of the statute, the six-hour time limitation does not commence until the professional staff determine that the patient meets the requirements of the statute and that referral to the CDMHP is necessary.
"`Where statutory language is plain and unambiguous, a statute's meaning must be derived from the wording of the statute itself.'" Swanson, 115 Wash.2d at 27, 804 P.2d 1 (quoting Human Rights Comm'n v. Cheney Sch. Dist. No. 30, 97 Wash.2d 118, 121, 641 P.2d 163 (1982)). A statute must be construed as a whole so as to give effect to all language and to harmonize all provisions. City of Seattle v. Fontanilla, 128 Wash.2d 492, 498, 909 P.2d 1294 (1996). *985 Because civil commitment statutes involve a deprivation of liberty, they should be construed strictly. Swanson, 115 Wash.2d at 27, 804 P.2d 1. However, courts must "keep in mind the need to satisfy the intent of the statute while avoiding absurd results." Id. at 28, 804 P.2d 1.
We agree with the State that by its terms RCW 71.05.050 requires several events to occur before the hospital staff may refer a person to the CDMHP. First, a person must be brought to the hospital or agency for "observation or treatment." Second, the person must refuse voluntary admission. Third, the professional staff must "regard" the person as "presenting as a result of a mental disorder an imminent likelihood of serious harm, or as presenting an imminent danger because of grave disability." RCW 71.05.050.
Under the plain language of the statute, once these conditions are met, the professional staff "may detain such person for sufficient time to notify the [CDMHP] of such person's condition to enable the [CDMHP] to authorize such person being further held in custody ... but which time shall be no more than six hours from the time the professional staff determine that an evaluation by the [CDMHP] is necessary." RCW 71.05.050 (emphasis added).[10]
As the Court of Appeals noted, the statute does not define "determination" or describe when it occurs. In re Det. of C.W., 105 Wash.App. 718, 727, 20 P.3d 1052 (2001). The court reasoned that this occurs only "after professional staff at an [ED] screens, evaluates, and concludes that a patient meets the statutory criteria" listed above. Id. We agree. The plain language of the statute anticipates that the professional staff will need a period of time to examine a person in order to determine whether the person suffers from a mental disorder that is likely to cause "imminent likelihood of serious harm" or "imminent danger because of grave disability," whether he or she will refuse voluntary admission, and whether further custody is necessary. We, therefore, hold that the six-hour time limitation in RCW 71.05.050 begins to run when the professional staff determine that the statutory requirements have been met and that the person should be referred to the CDMHP.
A contrary reading of the statute, as advocated by the petitioners, would in effect require professional staff to essentially guess at the person's diagnosis before contacting the CDMHP. Because patients who initially present with psychiatric symptoms are often restrained to their beds or placed in a locked section of the hospital before being fully evaluated,[11] the petitioners' position would in essence require the six-hour period to begin when the person either enters the ED or is medically cleared. At this initial stage of evaluation, professional staff would merely have "reason to believe" that the person met the statutory criteria. This conclusion is inconsistent with the statute's use of the term "regard"[12] and the chapter's use of "reason to believe" in other sections. Compare RCW 71.05.050 with RCW 71.05.150(4)(b) (allowing police officer to take a person to evaluation and treatment facility or hospital ED if the officer has "reasonable cause to believe" that the person suffers from "a mental disorder and presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled") (emphasis added). Furthermore, the petitioners' interpretation ignores the realities of EDs, which often require prioritizing patients so that those with life-threatening conditions will be treated first.
Our holding is also consistent with the purposes of chapter 71.05 RCW. RCW 71.05.010 states:
*986 The provisions of this chapter are intended by the legislature:
(1) To prevent inappropriate, indefinite commitment of mentally disordered persons and to eliminate legal disabilities that arise from such commitment;
(2) To provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders;
(3) To safeguard individual rights;
(4) To provide continuity of care for persons with serious mental disorders;
(5) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures;

(6) To encourage, whenever appropriate, that services be provided within the community;
(7) To protect the public safety.
(Emphasis added.) Our interpretation of RCW 71.05.050 fulfills the legislative purpose. It helps to prevent "inappropriate, indefinite commitment" by providing professional staff with adequate time to evaluate persons brought to hospitals to ensure that lesser restrictive forms of treatment are not appropriate. It also ensures "prompt evaluation and timely and appropriate treatment." Our interpretation "encourage[s] the full use of all existing agencies [and] professional personnel." In modern medical practice, this necessarily includes hospital staff who must triage persons brought into EDs.
The petitioners assert that the predetention restraint is inconsistent with the statutory purpose of avoiding duplication of service. However, any duplication of services by the CDMHP and the ED staff is limited by the fact that under RCW 71.05.150(2), the CDMHP must take into account the "reliability and credibility" of persons providing information when deciding whether to involuntarily commit a person to 72-hour evaluation and treatment.[13] It would seem appropriate for a CDMHP to consider hospital professional staff to be reliable and credible sources of information, thus minimizing the need to further evaluate the person.[14]
Finally, the petitioners contend that holding that the six-hour time limitation in RCW 71.05.050 does not begin until the professional staff determine that the statutory criteria has been met and it is necessary to refer the person to the CDMHP would allow for a period of time in which a person is not detained but is also not free to leave the ED. They assert that this interpretation would conflict with Swanson.
In Swanson, this court considered when a 72 hour involuntary detention began. 115 Wash.2d at 31-33, 804 P.2d 1. We rejected the State's position that the 72 hour period began when the person actually arrived at the hospital, concluding that this would allow for a "period of time when the person is neither detained nor free to leave." Id. at 32, 804 P.2d 1. In so holding, the court stated that the "applicable statutes clearly do not support such a result." Id.
However, unlike the statutes in Swanson[15] where the court was unable to find support *987 for the period of predetention restraint, RCW 71.05.050 does allow for such a period of restraint, if necessary, to evaluate the person to determine whether he or she meets the statutory requirements for notifying the CDMHP. Therefore, our holding does not conflict with Swanson.

Due Process
The petitioners argue that interpreting the six-hour time limitation in RCW 71.05.050 as not beginning until the professional staff determine that it is necessary to refer the person to the CDMHP would violate a person's due process rights because it allows professional staff to "detain" a person without first determining that the person has "a mental disorder or that he or she is dangerous or gravely disabled." Pet. for Review at 4.
The State, on the other hand, argues that the Court of Appeals erred in imposing due process restrictions upon ED personnel. It contends that because neither the ED staff nor the hospital is a party to the court proceedings, trial courts are left to speculate about whether the ED conduct was appropriate based solely on "cryptic [ED] chart notes." Suppl. Br. of Resp't at 10. It asserts that "[r]equiring justification in court for the time spent on all evaluations which might lead to commitment would discourage [EDs] from making thorough evaluations and cause them to prematurely make inappropriate and/or avoidable referrals to CDMHPs resulting in increased commitments." Id. at 12, 804 P.2d 1.
A statute is presumed constitutional, and the party who is challenging it has the burden to prove the statute is unconstitutional beyond a reasonable doubt. Tunstall v. Bergeson, 141 Wash.2d 201, 220, 5 P.3d 691 (2000), cert. denied, 532 U.S. 920, 121 S.Ct. 1356, 149 L.Ed.2d 286 (2001). Involuntary commitment for mental disorders constitutes a significant deprivation of liberty that requires due process protections. Addington v. Texas, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); In re Harris, 98 Wash.2d 276, 279, 654 P.2d 109 (1982). As such, statutes involving a deprivation of liberty are to be strictly construed. Swanson, 115 Wash.2d at 27, 804 P.2d 1. Finally, where a statute is susceptible to an interpretation that may render it unconstitutional, courts should adopt, if possible, a construction that will uphold its constitutionality. Cross, 99 Wash.2d at 382-83, 662 P.2d 828.
RCW 71.05.050 does not provide a limit on the amount of time between a person's arrival at the hospital or agency and the professional staff's determination that referral to the CDMHP is appropriate. In deciding whether this undefined period of time comports with due process, we must balance several factors:
"`First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirement would entail.'"
LaBelle, 107 Wash.2d at 221, 728 P.2d 138 (quoting Dunner, 100 Wash.2d at 839, 676 P.2d 444 (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976))). We have previously recognized the imposition of procedural safeguards on civil commitment statutes in order to protect affected persons against abuses. Harris, 98 Wash.2d at 281, 287, 654 P.2d 109 (requiring judicial finding of "probable dangerousness" before a 72 hour evaluation and treatment summons may be issued even though this finding is not required by RCW 71.05.150). See also In re Det. of Chorney, 64 Wash.App. 469, 477, 825 P.2d 330 (1992) (because of the potential "curtailment of liberty effected under the civil commitment statute, the right to due process requires the intervention of an *988 impartial third party to ensure that procedural requirements have been met").
As the Court of Appeals concluded, the private interests at stake in this case are the same as those found in LaBelledeprivation of liberty and adverse social consequences to the individual. C.W., 105 Wash.App. at 731-32, 20 P.3d 1052. Furthermore, the State "has a legitimate interest, under its police and parens patriae powers, in promptly determining whether or not persons arriving at an [ED] may have mental disorders that fulfill the statutory criteria of RCW 71.05.050." Id. at 732, 20 P.3d 1052.
In addressing the second factorwhether additional safeguards are required to ensure that the statute complies with the constitutionthe Court of Appeals concluded that additional safeguards are necessary. Id. at 732, 20 P.3d 1052. It held that in order to comply with due process, the State had to prove by a preponderance of the evidence "that any delay between a person's arrival at an [ED] and detention and the professional staffs' determination to refer [the person] to the CDMHP is justified." Id. In making this showing, the State could
argue, without limitation, such factors as priorities set by the [ED] with respect to the order of care and treatment of its patients; the time necessary to screen and stabilize a patient; the time that it takes to conduct a thorough evaluation of a patient for possible referral to the CDMHP; the relative difficulty of evaluating the patient for possible referral to the CDMHP; whether the patient requires immediate medical care; and whether that person requires additional services such as an interpreter.
Id.
We agree with the Court of Appeals that it is necessary to impose due process safeguards on the time between a person's arrival at a hospital or agency and the professional staffs' determination that referral to the CDMHP is necessary to protect against the potential deprivation that may occur because of the lack of statutory time restraints on the time it takes professional staff to evaluate a person. The imposition of due process safeguards also addresses the State's concern that ED staff not be limited by courts in performing their duties to evaluate and treat patients. Although it imposes a burden on the State to prove that any delay is justified by a preponderance of the evidence, the State could meet its burden in most cases by reference to hospital records and statements by hospital personnel, both of which were submitted to the trial court in these cases. Furthermore, because the State may argue without limit many different reasons for the delay, it should not unduly burden ED staff or force them to treat noncritical patients before critical ones. Finally, we emphasize that our imposition of due process restrictions on hospital personnel applies only to situations in which a person is subsequently referred to a CDMHP pursuant to RCW 71.05.050.

Remedy
The petitioners assert that the Court of Appeals suggestion that dismissal may not be the appropriate remedy for violations of RCW 71.05.050 also conflicts with the holding in Swanson. They argue that the court in Swanson "was unequivocal that a violation of the statutory time requirements would require dismissal." Pet. for Review at 12.
The State argues that Swanson is not necessarily applicable because it dealt with violations of 72 hour detentions. It also states that Swanson suggested that dismissal may not be the appropriate remedy, but that the remedy may depend on several factors. The State seems to concede, however, that under Swanson dismissal may be proper if the State "`totally disregard[s] the requirements of the statute [or] fail[s] to establish legal grounds'" for the patients' commitment. Suppl. Br. of Resp't at 17 (quoting Swanson, 115 Wash.2d at 31, 804 P.2d 1).
In Swanson, the court evaluated when the 72 hour detention period began and when it ended pursuant to chapter 71.05 RCW. 115 Wash.2d at 25-26, 804 P.2d 1. RCW 71.05.180 allows a facility to detain a person "for evaluation and treatment for a period not to exceed seventy-two hours." If a facility wants to detain a person longer than 72 hours, a judicial hearing must be held to *989 determine whether there is probable cause for further detention. See RCW 71.05.200(1), RCW 71.05.240. Otherwise the person must be released at the end of the 72 hour period. RCW 71.05.200(1).
In the context of determining when the judicial hearing following a 72 hour involuntary detention began and, thus, whether the State's petition for further detention should have been dismissed, the court in Swanson stated:
If Harborview had totally disregarded the requirements of the statute or had failed to establish legal grounds for Swanson's commitment, certainly dismissal would have been proper. Indeed, it would have been required. However, if the intent of the statute is to be fulfilled and absurd results are to be avoided, dismissal cannot turn on the vagaries of scheduling, especially in these unpredictable and sensitive proceedings.
In light of the clear language of the statute and Washington case law concerning statutes impacting liberty interests, the time limits at issue must be strictly construed. However, we hold that, in the civil commitment context, a hearing begins when the court calendar begins and the parties' attorneys are ready to proceed. We take care to note, however, that our holding is expressly limited to this context, recognizing that it rests upon, and is guided by, the stated intent of the civil commitment statute.

115 Wash.2d at 31, 804 P.2d 1 (emphasis added).
We agree with the State that Swanson is not necessarily applicable to the situation at issue in this case. The statutory scheme analyzed in Swanson specifically required the release of a patient if a judicial proceeding was not held within 72 hours. See RCW 71.05.200(1). In contrast, in this case, there is no explicit statutory requirement that a petition for further detention be dismissed if RCW 71.05.050 is violated.[16] On the other hand, Swanson does seem to suggest that in determining whether a case is to be dismissed, courts should focus on the merits of the petition, the intent of the statute, and whether the State "totally disregarded the requirements of the statute." Swanson, 115 Wash.2d at 31, 804 P.2d 1.
The State asserts that dismissal of petitions for further detention is contrary to Washington courts' emphasis on deciding civil commitment cases on their merits. It contends that dismissing a petition for further detention based on a violation of RCW 71.05.050 sets too high a "burden of proof in a civil commitment proceeding itself." Suppl. Br. of Resp't at 15. Finally, the State argues that because the focus of the 14-day probable cause hearing is to determine "`whether the detainee is presently in need of treatment,'" it is inappropriate to dismiss petitions for violations which occurred during the person's initial observation and treatment in an ED. Id. at 18-19 (quoting In re Det. of V.B., 104 Wash.App. 953, 963, 19 P.3d 1062 (2001)).
In In re Detention of G.V., 124 Wash.2d 288, 877 P.2d 680 (1994), the court, relying on Swanson and LaBelle, emphasized the importance of deciding cases on their merits. Id. at 296, 877 P.2d 680. The court stated,
Underlying the involuntary treatment act is a tacit presumption in favor of deciding issues on the merits. This presumption furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment.
Id. Therefore, the court in G.V. held that the commissioner had abused his discretion in dismissing a petition for further detention with prejudice where the State violated the patient's right to refuse medication for the 24 hour period prior to the hearing. Id. at 295-97, 877 P.2d 680.
Similarly, in V.B. the Court of Appeals declined to require that the State prove at the 14-day probable cause commitment hearing that the "officer who initially detained *990 V.B. had reasonable cause to believe that she was mentally ill and presented either an imminent likelihood of serious harm or was gravely disabled at the time of the initial detention." 104 Wash.App. at 955, 19 P.3d 1062 (emphasis added). Although the court did not address the specific issue of whether dismissal of the 14-day involuntary detention petition was appropriate if the officer did not have reasonable cause to believe that the person met the statutory requirement of RCW 71.05.150(4)(b), it did determine that proof of the officer's reasonable belief was not required at the commitment hearing to order further detention. Id. at 963, 19 P.3d 1062.
In so holding, the court relied on the purpose of chapter 71.05 RCW and the procedural safeguards therein, as well as the specific requirements of RCW 71.05.230(1). Id. at 962-63, 19 P.3d 1062. The court determined that RCW 71.05.230(1), which authorizes continued detention for a person who has been subject to a 72 hour detention, focused on "whether the detainee is presently in need of treatment and thus needs to remain in detention." Id. at 963, 19 P.3d 1062. It also concluded that there were adequate procedural safeguards throughout the process, including evaluations by CDMHPs and facility physicians, to ensure that if further commitment were ordered without the officer's testimony, there would be no statutory or due process violation. Id. at 964-65, 19 P.3d 1062. Finally, it stated that "there are other civil and criminal remedies if the police fail to act in good faith or act with gross negligence." Id. at 965, 19 P.3d 1062 (citing RCW 71.05.120(1)).
Applying the principles of Swanson, G.V., and V.B., we conclude that dismissal is not the appropriate remedy for violations of RCW 71.05.050. As with the police officer in V.B., a question as to whether the professional staff may have detained a person in violation of the statute should not affect whether the person meets the statutory requirements for further detention. Our conclusion is also consistent with G.V. and Swanson's emphasis on deciding cases on their merits and Swanson's suggestion that the courts should look to the intent of the statute when determining whether dismissal is appropriate. However, dismissal may be appropriate in the few cases where hospital staff or the CDMHP "totally disregarded the requirements of the statute." Swanson, 115 Wash.2d at 31, 804 P.2d 1.
The petitioners contend that because the statutory civil remedies are not available in these cases, dismissal is required in all circumstances where RCW 71.05.050 has been violated. They argue that RCW 71.05.120 limits the liability of CDMHPs and ED staff to only those situations involving gross negligence and that RCW 71.05.510 is not applicable because it applies only to violations in which a person is held for more than the allowable number of days. Thus, they assert that they had no alternative remedy in this case.
Although we do not necessarily agree with the petitioners' contention that a person asserting a violation of RCW 71.05.050 is without a civil remedy, any limitation on civil liability is only one factor to consider when determining whether dismissal is the proper remedy. As discussed above, the purpose of the statute as well as the presumption in favor of deciding cases on the merits tends to weigh against dismissing all cases in which RCW 71.05.050 is violated. Furthermore, allowing dismissal in cases where the professional staff totally disregarded the statutory requirements serves as a general safeguard against abuse.

Application of RCW 71.05.050 to Petitioners' Cases
In five of the six cases, the petitioner was detained within six hours of the professional staff's determination that referral to the CDMHP was necessary. C.W. (referral made at 12:20 p.m.; C.W. was detained by CDMHP at 4:10 p.m.); T.B. (referral made at 3:30 a.m.; T.B. was detained by CDMHP at 6:45 a.m.); D.M. (referral made at 3:00 p.m.; D.M. was detained by CDMHP at 6:40 p.m.); E.S. (referral made at 1:10 a.m.; E.S. was detained by CDMHP at 6:15 a.m.); R.F. (referral made at 12:55 p.m.; R.F. was detained by CDMHP at 5:55 p.m.).
In B.B.'s case, there is no record of the time the hospital social worker determined *991 that referral to the CDMHP was necessary. B.B. was admitted to the ED at 5:50 p.m. and interviewed by the social worker at 6:16 p.m. B.B. was detained by the CDMHP at 11:58 p.m. Assuming that the social worker made the referral immediately upon interviewing B.B. at 6:16 p.m., the six-hour limit would not have been violated; any later referral and the time limit still would not be violated. Any earlier referral would seem unlikely under these circumstances.
Applying the due process limitation to the six cases, the Court of Appeals concluded that the State failed to meet its burden of showing that any delay in treatment or referral was justified in D.M.'s and E.S.'s case. Because we uphold the standard articulated by the Court of Appeals and because neither side has argued that the court's analysis was incorrect, we see no need to reevaluate it.
Finally, because the petitioners have not argued, nor could they,[17] that the professional staff or the CDMHP "totally disregarded the requirements of the statute," we conclude that dismissal was not the appropriate remedy in either D.M.'s or E.S.'s case.
The Court of Appeals is affirmed.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, IRELAND and OWENS, JJ., concur.
SANDERS, J. (dissenting).
A government may be so constituted, as no man shall be compelled to do things to which the law does not oblige him, nor forced to abstain from things which the law permits.
Baron De Montesquieu, The Spirit of the Laws 150 (Thomas Nugent transl., Hafner Press 1949).
The issue here is under what circumstances, and for what length of time, an individual may be lawfully imprisoned, albeit shackled, in a hospital emergency room under color of law.
I begin with the background presumption of a free society that liberty is the norm and incarceration is the exception, an exception which must be lawfully justified. Our search for that legal justification surely leads us to RCW 71.05.050. This statute provides affirmative legal authority to detain someone up to six hours. In pertinent part that statute provides
Any person voluntarily admitted for inpatient treatment to any public or private agency shall be released immediately upon his or her request.... PROVIDED FURTHER, That if a person is brought to the emergency room of a public or private agency or hospital for observation or treatment, the person refuses voluntary admission, and the professional staff of the public or private agency or hospital regard such person as presenting as a result of a mental disorder an imminent likelihood of serious harm, or as presenting an imminent danger because of grave disability, they may detain such person for sufficient time to notify the county designated mental health professional of such person's condition to enable the county designated mental health professional to authorize such person being further held in custody or transported to an evaluation treatment center pursuant to the conditions in this chapter, but which time shall be no more than six hours from the time the professional staff determine that an evaluation by the county designated mental health professional is necessary.
Id.
This provision follows a declaration of legislative intent [t]o provide prompt evaluation and timely and appropriate treatment of persons with serious mental disorders and [t]o safeguard individual rights. RCW 71.05.010(2), (3). Since this statute involves a deprivation of liberty it must be construed strictly. In re Det. of Swanson, 115 Wash.2d 21, 27, 793 P.2d 962, 115 Wash.2d 21, 804 P.2d 1 (1990); In re Cross, 99 Wash.2d 373, 379, 662 P.2d 828 (1983).
*992 In Swanson, for example, one issue was when the 72 hour emergency custody period began for purposes of RCW 71.05.150(2). That statute provided a person may be taken into emergency custody in an evaluation and treatment facility for not more than seventy-two hours. However the hospital claimed the 72 hour period did not begin until the person actually arrived at the treatment facility (thereby excluding travel time), whereas the prisoner claimed that scenario would necessarily leave an unspecified period of time when the person is neither detained nor free to leave. Swanson, 115 Wash.2d at 32, 804 P.2d 1. Affording the statute a strict construction, we agreed with the prisoner, holding the 72 hour period includes travel time.
The statute at issue in this case affirmatively furnishes the necessary lawful authority to hold, detain, restrain, or imprison one in a hospital emergency room under the statutory criteria. Equally as apparent is the limitation on the grant of that authority: six hours from the time staff regard[s] or determine[s] that as a result of a mental disorder the individual presents an imminent danger to himself or others.
But here more than six hours elapsed from the time each of these individuals was imprisoned (sometimes shackled to a gurney by each wrist and each ankle) until seen by a designated mental health professional.
The majority opines that the clock doesn't start running at the first point of imprisonment but rather from some later point of time when a more considered judgment might be made. Although this is a plausible interpretation of the statute, I posit it is a tortured one which misses the point, and yields other problems which the majority does not acknowledge.
If someone is imprisoned upon his arrival at the emergency room for some hours before the staff regards him as potentially committable, what is the lawful authority for that initial period of predetention restraint (majority at 987)?[1] The majority doesn't tell us and I am aware of none.
Rather, it would appear that this unspecified period of time when the person is neither detained nor free to leave[2] is imprisonment without lawful authority and thereforeunlawful imprisonment. Certainly this initial period is no less a massive curtailment of liberty than any subsequent period and is thus subject to the same constitutional concerns and safeguards. Without benefit of statute it is accomplished by brute force alone, affording the victim neither prior judicial hearing, counsel, nor the rudiments of humane respect and decency.
By the majority's logic the statute provides neither lawful justification for the initial imprisonment nor even an abstraction of necessity based upon the victims' mental state, as the majority holds this initial detention occurs without regard for such a justification. I hasten to qualify, however, that while necessity may be the mother of invention, it is a poor relation to legality.
The alternative approach, where the clock starts ticking from the first moment of imprisonment in the emergency room, seems not only faithful to reality and less problematic for all concerned, but in perfect keeping with the statutory text.
It is faithful to reality because it seems quite apparent that the individual is being restrained because, in fact, the hospital staff regards him as a mental case necessarily imprisoned to prevent his escape. Why else are they keeping him? Moreover, the hospital and staff rely upon the statute at issue here to furnish the lawful justification for imposing and maintaining that restraint until the mental health professionals takes him off their hands.
I assume in the normal course of events, six hours is ample time for the emergency room staff to operate within this legal window of authority. However if I assume wrong, the remedy is for the legislature to determine by way of statute and/or constitutional amendment, not this court.
Quixotically, under the majority's theory even if the total length of imprisonment were *993 under six hours, almost invariably the initial period of that detention would be outside the statutory authorization, i.e., before the staff regarded the prisoner as committable. Thus in almost every situation as seen by the majority, incarceration in the emergency room would necessarily begin with some period of incarceration not lawfully justified by the statute. This is an intolerable offense against liberty.
A society committed to liberty must demand prompt assessment of the alleged mentally ill by emergency room staff. The majority contemplates individuals may be restrained against their will without lawful authority for an indefinite period before making a determination that an examination by the county designated mental health professional is even necessary. Such unlawful restraint is inconsistent with the statute and violates the due process of law clauses of our state and federal constitutions.
I dissent.
CHAMBERS, J., concurs.
NOTES
[1] B.B. Clerk's Papers (CP) at 2, 22.
[2] Id. at 22.
[3] T.B. CP at 53.
[4] Id. at 60.
[5] R.F. Report of Proceedings (RP) at 16.
[6] In re Det. of C.W., 105 Wash.App. 718, 20 P.3d 1052 (2001).
[7] Id. at 723, 20 P.3d 1052.
[8] Id. at 728, 20 P.3d 1052.
[9] In re Det. of C.W., 145 Wash.2d 1007, 37 P.3d 290 (2001).
[10] The final clause of RCW 71.05.050, "from the time the professional staff determine that an evaluation by the [CDMHP] is necessary," was added in 1997. See Laws of 1997, ch. 112, § 5.
[11] For example, at Harborview, patients who initially present with psychiatric symptoms are generally taken to the CTU, a locked section of the ED, after an initial evaluation by the admission's nurse. See R.F. RP at 7-8, 20-21 (social worker testimony as to general admissions practices of Harborview).
[12] "Regard" is defined as "to take into account; consider." WEBSTER'S NEW WORLD DICTIONARY 1195 (2d ed.1978).
[13] RCW 71.05.150(2) states:

When a [CDMHP] receives information alleging that a person, as the result of a mental disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled, after investigation and evaluation of the specific facts alleged and of the reliability and credibility of the person or persons providing the information if any, the county designated mental health professional may take such person, or cause by oral or written order such person to be taken into emergency custody in an evaluation and treatment facility for not more than seventy-two hours as described in RCW 71.05.180.
[14] For example, the social worker who evaluated R.F. testified that the CDMHPs rely on hospital staff's effort to place the person in a respite bed or otherwise "dispose of the patient." R.F. RP at 31-33.
[15] See RCW 71.05.150(2) (a person may "be taken into emergency custody in [a treatment facility] for not more than seventy-two hours"); RCW 71.05.180 ("If the [treatment facility] admits the person, it may detain him or her for evaluation and treatment for a period not to exceed seventy-two hours...."); RCW 71.05.200(1)(a) (if a person is detained for evaluation and treatment, unless the person is released or agrees to voluntary commitment, a judicial hearing shall be held "not more than seventy-two hours after the initial detention to determine whether there is probable cause to detain the person ... for up to an additional fourteen days"); RCW 71.05.210 ("A person who has been detained for seventy-two hours shall no later than the end of such period be released, unless referred for further care on a voluntary basis, or detained pursuant to court order for further treatment...."); RCW 71.05.240 (a court must hold a probable cause hearing within 72 hours of initial detention if a petition is filed for 14-day or 90-day involuntary treatment).
[16] Although R.F. moved to dismiss the State's petition for a violation of the 72-hour rule at his mental health hearing, none of the petitioners argued to the Court of Appeals or this court that they were held in excess of the 72-hour detention period.
[17] The petitioners' assertion that a civil action is not available to them because neither the professional staff nor the CDMHP acted with bad faith or gross negligence would seem to negate any argument that either the professional staff or the CDMHP "totally disregarded the requirements of the statute."
[1] An Orwellian term if there ever was one.
[2] In re Det. of Swanson, 115 Wash.2d 21, 32, 793 P.2d 962, 115 Wash.2d 21, 804 P.2d 1 (1990).