**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of<br><br>D.H.,<br><br>Appellant. | No. 54865-8-II<br><br>PUBLISHED OPINION |

MAXA, J. – DH appeals the trial court's order involuntarily committing him for 14 days of treatment under former RCW 71.05.230 (2019).

DH was placed in emergency detention for a 72-hour evaluation period after his mother reported that he was behaving strangely. A designated crisis responder (DCR) evaluated DH for purposes of a 14-day detention for involuntary treatment, but did not file a petition for a 14-day detention because DH agreed to voluntary inpatient treatment. DH was transferred to Wellfound Behavioral Health Hospital. Later, DH demanded to leave, making his continued detention involuntary. At the end of the 72-hour period but while DH still was detained, a DCR evaluated DH again and ordered another 72-hour detention. Wellfound staff then filed a timely petition for a 14-day involuntary commitment.

DH moved to dismiss the petition because he was detained for more than the statutory 72-hour maximum without a hearing. The trial court denied DH's motion to dismiss. After a hearing, the court found that DH was gravely disabled and ordered that DH be committed for 14 days for involuntary treatment. The court did not inform DH at the beginning of the hearing as

No. 54865-8-II

required by statute that he could lose his firearm rights if he did not voluntarily consent to treatment, but DH did not object.

We hold that (1) dismissal of the 14-day petition was not required because the trial court did not abuse its discretion in determining that Wellfound did not totally disregard the statutory requirements of the Involuntary Treatment Act (ITA), chapter 71.05 RCW, in detaining DH for more than 72 hours, (2) DH cannot challenge the trial court's failure to advise regarding firearm rights for the first time on appeal because there was no manifest constitutional error under RAP 2.5(a)(3), and (3) the trial court's factual findings support the court's conclusion that DH was gravely disabled. Accordingly, we affirm the trial court's 14-day involuntary commitment order.

## FACTS

*Background*

On April 29, 2020, DH was detained for 72 hours and brought to Allenmore Hospital from his home where he resides with his mother, who reported that he was acting strangely. DH complained that his "mother and brother poisoned me and people are pretending to be people I know." Clerk's Papers (CP) at 55. Angela Loi, a DCR, evaluated DH. DH told Loi he would accept inpatient psychiatric treatment and did not want to return home. Because DH agreed to voluntary treatment, Loi did not file a petition for 14 days of involuntary commitment. Loi coordinated with Wellfound to have DH transferred there.

DH arrived at Wellfound on Thursday, April 30. Ian Callahan, Wellfound's ITA coordinator, met with DH on May 1 and determined that DH's detention was not voluntary and that DH did not want to be in the hospital. Callahan attempted to get DH to stay voluntarily, but DH repeatedly refused. DH demanded to leave, stating that his detention was a conspiracy and

2

they were stealing his intellectual property. In addition, DH showed symptoms of delusions and said that he was going to kill his mother because she was an imposter.

DH's 72-hour detention expired at 9:48 PM on May 4. However, Wellfound did not release him.

On May 5, a DCR reevaluated DH and recommended another 72-hour detention. Callahan then filed the 14-day petition. The petition stated, "The Respondent has been advised of the need for treatment, and the Petitioners have evidence that the Respondent has not in good faith agreed to voluntary treatment. *The Respondent has also been informed of the loss of firearm rights if involuntarily committed.*" CP at 12 (emphasis added).

DH subsequently filed a motion to dismiss the 14-day petition on the grounds that Wellfound totally disregarded ITA requirements by detaining him for more than the 72 hours after his initial detention allowed by statute.

*Hearing on the Petition*

The trial court conducted an evidentiary hearing on Wellfound's 14-day petition. At the beginning of the hearing, the court did not advise DH orally and in writing that he could lose his firearm rights if he did not voluntarily consent to treatment. DH did not object to the court's failure to advise regarding firearm rights.

Loi and Callahan testified to the facts stated above. Dr. Leslie Hernandez, a psychiatrist at Wellfound, also testified. She evaluated DH for mental disorders on May 4 and observed DH having delusions of people being replaced by imposters and people telepathically telling him to kill his mother. Dr. Hernandez recommended DH for continued hospitalization for safety.

Callahan testified about his interaction with DH during his evaluation. He testified that Dr. Hernandez diagnosed DH with unspecified schizophrenia and that he believed DH was

3

gravely disabled. Callahan also testified that there was no less restrictive treatment at that time

because DH categorically denied he had a mental disorder and refused treatment. Callahan

stated that DH told him that he did not personally own any firearms, but could probably get

access to one.

DH testified that he wanted to leave Wellfound, and never wanted to hurt himself, his

mother, or anyone else. He only agreed to the initial 72-hour detention because he thought they

would determine he was completely fine and not trying to hurt anyone.

The trial court denied DH's motion to dismiss the petition because it found the

consecutive 72-hour detentions were not a total disregard of DH's rights. The court then found

that DH suffered from a mental disorder and was gravely disabled. The court determined that

there were no less restrictive placements and ordered a 14-day detention for evaluation and

treatment. The court also told DH that he had lost his right to possess a firearm.

The trial court issued findings of fact and conclusions of law. The court made the

following findings regarding DH's current mental status:

> [DH] initially was cooperative but then became irritable. He remains irritable and
> agitated. He believes there is a conspiracy to keep him at Wellfound. His memory
> was impaired. He had difficulty recalling stories around his detention. . . .
> [I]nitially his voice was rapid and pressured. He could hear voices and they could
> hear his thoughts. He said CIA wanted to restrict his speech. He still jumps from
> subject to subject. [DH] denies he has a mental illness, and this was all a
> conspiracy. He still reports delusional ideation. He still believes he was put in the
> hospital by a government conspiracy. At one point, [DH] said he would get a
> loaded firearm and hold it to someone's head, so they have to tell the truth.

CP at 94-95. The court also found that DH "does not take medications as prescribed." CP at 95.

The court found that DH "manifests severe deterioration in routine functioning evidenced

by repeated and escalating loss of cognitive or volitional control over his or her actions and is not

4

No. 54865-8-II

receiving such care as is essential for his or her health or safety." CP at 95. The court entered a conclusion of law that DH was gravely disabled.

DH appeals the trial court's order committing him for 14 days of involuntary treatment.

ANALYSIS

A.    SUCCESSIVE 72-HOUR DETENTIONS

DH argues that the trial court erred in denying his motion to dismiss Wellfound's petition for a 14-day involuntary detention because he was subjected to two successive 72-hour detentions without a court hearing, which he claims violated due process and totally disregarded the requirements of the ITA. We disagree.[1]

1.    Legal Principles

a.    72-Hour and 14-Day Detentions

A DCR can order that a person be taken into emergency custody for not more than 72 hours when they receive information that the person, because of a mental disorder, presents "an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled." Former RCW 71.05.153(1) (2019).[2] The 72-hour period does not include Saturdays, Sundays, or holidays. Former RCW 71.05.180 (2019).

A person detained for 72 hours for evaluation and treatment may be committed for 14 additional days of involuntary treatment. Former RCW 71.05.230 (2018). But a petition for

---

[1] The State does not argue that dismissal of the 14-day petition was not an allowable remedy for the alleged ITA violation regarding the initial 72-hour detention. In *In re Detention of N.G.*, this court held that dismissal is an allowable remedy as long as the petitioner totally disregarded ITA requirements. No. 54362-1-II, slip op. at 10-13 (Wash. Ct. App. Jan. 25, 2022), https://www.courts.wa.gov/opinions/pdf/D2%2054362-1-II%20Published%20Opinion.pdf.

[2] The current version of this statute and related statutes now provide for a 120-hour detention rather than a 72-hour detention. RCW 71.05.153(1) (2021).

No. 54865-8-II

continued commitment can be filed only if certain requirements are met. Former RCW 71.05.230. One requirement is that "[t]he person has been advised of the need for voluntary treatment and the professional staff of the facility has evidence that he or she has not in good faith volunteered." Former RCW 71.05.230(2).

When a petition for a 14-day involuntary commitment has been filed, the court must hold a probable cause hearing on the petition within 72 hours of the initial detention. Former RCW 71.05.240(1) (2019). A person who has been detained for 72 hours must be released at the end of that period unless a court orders continued detention for further treatment or the person is referred for further care on a voluntary basis. Former RCW 71.05.210(1)(b) (2019).

Any person who voluntarily is admitted to a public or private agency for inpatient treatment must be released upon request. Former RCW 71.05.050(1) (2019). However, if the professional staff of the agency regards the person requesting discharge as "presenting, as a result of a mental disorder . . . , an imminent likelihood of serious harm, or is gravely disabled, they may detain such person for sufficient time to notify the [DCR] of such person's condition to enable the [DCR] to authorize such person being further held in custody." Former RCW 71.05.050(2).

RCW 71.05.510 states: "Any individual who knowingly, willfully or through gross negligence violates the provisions of this chapter by detaining a person for more than the allowable number of days shall be liable to the person detained in civil damages."

b.   "Totally Disregarded" Standard

The question here is whether the trial court should have dismissed Wellfound's petition for a 14-day involuntary commitment because Wellfound violated the applicable ITA provisions.

6

RCW 71.05.010(2)[3] states:

> When construing the requirements of this chapter the court must focus on the merits of the petition, *except where requirements have been totally disregarded*, as provided in *In re C.W.*, 147 Wn.2d 259, 281 (2002). A presumption in favor of deciding petitions on their merits furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment.

(Emphasis added.) In *In re Detention of C.W.*, the Supreme Court suggested that "in determining whether a case is to be dismissed, courts should focus on the merits of the petition, the intent of the statute, and whether the State " 'totally disregarded the requirements of the statute.' " 147 Wn.2d 259, 281, 53 P.3d 979 (2002) (quoting *In re Det. of Swanson*, 115 Wn.2d 21, 31, 804 P.2d 1 (1990)).

RCW 71.05.010(2) reflects the principle that "[d]ismissal of an involuntary treatment petition and release of the person subject to the petition is not often the proper remedy because of the importance of providing treatment to those requiring it." *In re Det. of C.V.*, 5 Wn. App. 2d 814, 822, 428 P.3d 407 (2018).

The trial court must consider the totality of the circumstances in determining whether a petitioner has "totally disregarded" ITA requirements, including:

> (1) whether the violation of the statutory requirements occurred knowingly, willfully or through gross negligence; (2) the extent of the deprivation of the committed person's liberty; (3) the extent to which the petitioner's conduct and the committed person's requested remedy are protective of the committed person's health and safety and reflects appropriate treatment of the committed person; and (4) the extent to which the petitioner's conduct and the committed person's requested remedy are protective of the safety of the public.

---

[3] Although RCW 71.05.010(1) has been amended since the events at issue here, RCW 71.05.010(2) has not. Therefore, we cite to the current version of the statute.

No. 54865-8-II

*In re Det. of N.G.*, No. 54362-1-II, slip op. at 17 (Wash. Ct. App. Jan. 25, 2022), https://www.courts.wa.gov/opinions/pdf/D2%2054362-1-II%20Published%20Opinion.pdf. We review a trial court's totality of the circumstances determination for an abuse of discretion. *Id.*

2.     Total Disregard of ITA Requirements

The State does not argue that failing to release DH after the initial 72-hour detention did not violate the statutory requirements of the ITA. Instead, the State argues that the trial court did not err in ruling that Wellfound's conduct did not totally disregard those requirements. We agree.

Three of the *N.G.* factors support the trial court's determination that Wellfound did not totally disregard ITA requirements in detaining DH.

First, although Wellfound may have deliberately detained DH beyond the original 72-hour period, Wellfound did not willfully violate the ITA. DH initially agreed to voluntary inpatient treatment, but then he demanded to leave after it was too late for Wellfound to file a 14-day petition. DH's change in position caused the problem about which he now complains. And Wellfound did not simply detain DH indefinitely without cause. Instead, Wellfound had DH evaluated by another DCR to see if he still met the criteria for a 72-hour detention, and then Wellfound promptly filed a 14-day petition. Wellfound tried in good faith to comply with the ITA in a situation not expressly covered by ITA provisions.

Second, even if we assume a technical violation of the ITA's requirements, DH's resulting improper deprivation of liberty was relatively minimal. To the extent that DH's detention after 9:48 PM on May 4 was unlawful, that detention was relatively brief – lasting only until the next day when a DCR again ordered a 72-hour detention.

8

No. 54865-8-II

Third, releasing DH created a significant risk to public safety because he was delusional and had threatened to kill his mother. Wellfound's conduct in detaining DH until he could be evaluated again was protective of public safety, and specifically the safety of DH's mother. Conversely, immediate release would have posed a serious risk to public safety.

We conclude that the trial court did not abuse its discretion in ruling that any violations by Wellfound did not constitute a total disregard of the ITA requirements.

B. FAILURE TO ADVISE REGARDING FIREARM RIGHTS

DH argues that the trial court's failure to advise him that involuntary commitment would result in the loss of his firearm rights in violation of former RCW 71.05. 240(2) (2019) requires that the court's 14-day detention order be reversed. We decline to address this argument for the first time on appeal.

Under federal law, it is unlawful for a person to possess a firearm if they have "been adjudicated as a mental defective or . . . committed to a mental institution." 18 U.S.C.A. § 922(g)(4).

Former RCW 71.05.240(2) states:

> If the petition is for mental health treatment, the court at the time of the probable cause hearing and before an order of commitment is entered shall inform the person both orally and in writing that the failure to make a good faith effort to seek voluntary treatment as provided in RCW 71.05.230 will result in the loss of his or her firearm rights if the person is subsequently detained for involuntary treatment under this section.

As noted above, former RCW 71.05.230(2) provides that a petition for a 14-day involuntary commitment cannot be filed unless "[t]he person has been advised of the need for voluntary treatment and the professional staff of the facility has evidence that he or she has not in good faith volunteered."

9

No. 54865-8-II

The State concedes that the trial court violated this statute by failing to advise DH at the beginning of the probable cause hearing that he could lose his firearm rights if he did not voluntarily consent to treatment. However, DH did not object to the trial court's failure to advise him regarding his firearm rights.

A claim of error may be raised for the first time on appeal if it involves a manifest error affecting a constitutional right. RAP 2.5(a)(3). This issue affects a constitutional right because a person has the right to bear arms under the Second Amendment to the United States Constitution and article I, section 24 of the Washington Constitution. The question here is whether the error was manifest. *See In re Det. of A.F.*, ___ Wn. App. 2d ___, 498 P.3d 1008, 1014-15 (2021) (analyzing whether the failure to properly advise regarding firearm rights constituted manifest error).

An error is manifest if an appellant shows that the error had " 'practical and identifiable consequences.' " *State v. A.M.*, 194 Wn.2d 33, 39, 448 P.3d 35 (2019) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). Three facts show that the error here was not manifest.

First, there was evidence that DH knew that he would lose his firearm rights if involuntarily committed even if the trial court did not inform him of that fact. Wellfound's 14-day petition stated that DH had been informed that he would lose his firearm rights if involuntarily committed. DH does not deny this fact. In addition, the record shows that DH previously was involuntarily committed in October 2019, only six months earlier. Presumably, DH was advised at that time that he had lost his firearm rights because he was involuntarily committed.[4]

---

[4] The State suggests that DH already had lost his firearm rights as a result of the previous commitment. But the record does not show whether DH still was precluded from possessing firearms in May 2020 as a result of the October 2019 commitment.

10

Second, the record shows that DH would not have agreed to voluntary treatment even if he had been advised that he would lose his firearm rights if involuntary committed. Although he initially agreed to voluntary treatment, DH later became upset and repeatedly demanded to be released. At his initial evaluation with Loi, DH denied any need for inpatient or outpatient mental health treatment. Later, he continued to believe that he had been wrongly detained because of a government conspiracy and a conspiracy among the technology companies.

Third, Callahan testified that DH said that he did not own any firearms. Therefore, there is no indication that the loss of firearm rights would have caused DH to agree to voluntary treatment only to preserve those rights.

We hold that the trial court's error in failing to advise DH that he would lose his firearm rights if he was involuntarily committed was not a manifest error. Therefore, we decline to consider DH's argument.[5]

C.      GRAVELY DISABLED

DH argues that the trial court's factual findings do not support the court's conclusion that he was gravely disabled. We disagree.

At the end of a probable cause hearing, if the court finds by a preponderance of the evidence that the person is gravely disabled and that there are no other less restrictive alternatives to involuntary detention, the court must order no more than 14 days of involuntary treatment. Former RCW 71.05.240(3)(a).

---

[5] In *In re Detention of T.C.*, Division One of this court held that the trial court's failure to comply with RCW 71.05.240(2) in that case constituted manifest constitutional error. 11 Wn. App. 2d 51, 61, 450 P.3d 1230 (2019). That case is factually distinguishable. However, even if we considered DH's argument under RAP 2.5(a)(3), we would hold that any error was harmless based on the analysis above.

11

No. 54865-8-II

> Gravely disabled means:
>
> a condition in which a person, as a result of a mental disorder, or as a result of the use of alcohol or other psychoactive chemicals: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety;

Former RCW 71.05.020(21) (2020) (LAWS OF 2020, ch. 256, § 301).

The superior court found that DH was gravely disabled under subsection (b). This subsection has two separate requirements: (1) a severe deterioration in routine functioning, and (2) failure to receive treatment that is essential for health or safety. *In re Det. of LaBelle*, 107 Wn.2d 196, 205, 728 P.2d 138 (1986). Regarding the first requirement, the State must provide recent proof of "significant loss of cognitive or volitional control." *Id.* at 208. Regarding the second requirement, "the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety." *Id.*

The trial court's findings showed DH's severe deterioration in routine functioning that reflected a significant loss of cognitive or volitional control. The court found that DH believed there was a conspiracy to keep him at Wellfound, heard voices, believed the CIA wanted to restrict his speech, and had delusional ideations. And at one point, DH said he would hold a loaded firearm to someone's head so they would reveal the truth.

The trial court's findings regarding DH not receiving essential care if released were less detailed. However, the court found that DH denied that he had a mental illness and that his detention was part of a conspiracy, and that DH did not take his medication as prescribed. These

12

No. 54865-8-II

findings are sufficient to support the conclusion that DH would not receive care that was essential for his health or safety if released.

We hold that the trial court's factual findings support the court's conclusion that DH was gravely disabled.

CONCLUSION

We affirm the trial court's 14-day involuntary commitment order.

MAXA, J.

We concur:

LEE, C.J.

GLASGOW, J.

13