**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 27, 2023

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 27, 2023

*Erin Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| In the Matter of the Detention of D.H., Petitioner. | No. 100716-7 En Banc Filed: July 27, 2023 |

WHITENER, J.—This case concerns the test and remedy for when the State "totally disregards" the involuntary treatment act (ITA). [1] *See* RCW 71.05.010(2).

DH was taken into emergency custody on an involuntary 72-hour hold as authorized by former RCW 71.05.153(1) (2019). Under the statutory scheme, at the end of 72 hours, the person shall be released, unless detained pursuant to a court order or referred for voluntary treatment. *See* former RCW 71.05.210(1)(b) (2019). Instead of filing for a 14-day commitment court order, the State let the 72-hour hold expire and did not release DH, although he had been asking to leave for days. The State kept him detained overnight and evaluated him again the next morning for a

---

[1] The consolidated cases of *In re Detention of A.C.*, No. 100668-3, and *In re Detention of N.G.*, No. 100690-0, share this issue of "total disregard" as companion cases.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

new 72-hour hold and filed a petition for a 14-day commitment. At DH's subsequent 14-day hold hearing, he argued that he was entitled to dismissal because the State had totally disregarded the requirements of the ITA. The court denied the motion to dismiss and granted the new 14-day petition.

We hold that the State totally disregards the ITA when it detains, or continues to detain, someone without authority of law under the ITA. Therefore, in this case, the State totally disregarded the requirements of the ITA when it failed to release DH at the end of the 72-hour period as mandated by statute. It is unacceptable and constitutes a total disregard of the ITA to intentionally allow the statutory time limit to expire and keep someone overnight against their will and without authority under the ITA in order to then file a new petition on the same grounds.[2] The trial court abused its discretion when it did not so hold and did not dismiss the new petition. Accordingly, we reverse the Court of Appeals and remand to the trial court for dismissal of the petition and any further proceedings consistent with this opinion.

We also granted review of whether failure to inform a committed person about a loss of firearm rights for involuntary treatment constitutes a "manifest error affecting a constitutional right" such that this court should review the unpreserved

---

[2] Contrary to the dissent's assertion, we are not adopting a "'negligence-plus' standard," nor are we creating an intent requirement. Dissent at 4 n.1. We highlight the intentional failure to follow the statutory directives in this case because it is problematic and analogize to the so-called "negligence-plus" standard to help illustrate what would constitute total disregard.

issue under RAP 2.5(a)(3). Given our resolution of dismissal of the petition we decline to reach this issue.

FACTS AND PROCEDURAL HISTORY

On Wednesday, April 29, 2020, DH's mother referred DH for evaluation because of concerns regarding DH's labile mood, delusions, paranoia, vague threats toward his family, and lack of sleep. A designated crisis responder (DCR) contacted the mother and DH and concluded that DH should be detained. DH was detained and brought to Allenmore Hospital under a 72-hour hold for involuntary treatment due to grave disability pursuant to former RCW 71.05.153(1). He was admitted at 9:48 p.m. that night. During his admission, DH was informed that he "will be released within a period of 72 hours, excluding Saturdays, Sundays and holidays, unless a judicial hearing is held. The hearing must be held within 72 hours after your initial detention to determine whether there is a [(sic)] probable cause to detain you for up to an additional 14 days." Sealed Clerk's Papers (CP) at 33. Under this timeline, DH's 72-hour hold was set to expire on Monday, May 4, 2020 at 9:48 p.m. The State initiated emergency detention proceedings.

On April 30, 2020, DH was evaluated for a petition for 14 days of involuntary treatment. The evaluator observed that DH was alert and oriented to where he was and the purpose of the evaluation. The evaluator ultimately did not file a 14-day petition because "[DH] stated very clear[ly] he would like to further accept inpatient

3

psychiatric treatment and he refused to return to his mother's home." Sealed Verbatim Report of Proceedings (VRP) at 15. DH was then transferred to Wellfound Behavioral Health Hospital. Although DH could have been transferred as a voluntary patient, Allenmore transferred him as an involuntary patient.

The Wellfound ITA treatment court supervisor, Ian Callahan, met with DH shortly after he arrived at Wellfound on the evening of April 30, 2020. DH informed Callahan that he was upset and did not want to be in the hospital and that he wanted to leave.

Callahan initially thought that DH was transferred as a voluntary patient but learned in the morning of May 1, 2020, that DH was transferred as an involuntary 72-hour hold patient. Callahan was initially "anxious because [he] didn't know that someone had already done a 14-day evaluation and decided not to file." *Id*. at 26. He then spoke to the evaluator for more information about the situation.

Callahan later interacted with DH, who was again upset and asking to leave. Callahan testified that he did not think that DH would be a "good fit" for a voluntary patient given his outbursts and delusions regarding treatment. *Id*. at 28. When asked why he did not file his own 14-day petition at that point, Callahan testified,

> It was our understanding that we couldn't do back to back detention investigations or detentions and so it was our understanding that we had to allow the current 72-hour hold to elapse, and during that time it was our job to continue to try to engage the patient in voluntary treatment services with the hope that the patient would stay voluntarily or stabilize.

. . . .

> It was our understanding that we could not refer the individual back to for [sic] a new 72-hour detention or any type of commitment proceeding until the hold had expired and then that person was reevaluated by a mental health professional and a new assessment was filed.

*Id*. at 29.

DH's 72-hour hold expired on Monday, May 4, 2020, at 9:48 p.m., but Wellfound did not release him as required under the statute.

On May 5, 2020, DH was evaluated again by another DCR. That DCR concluded that DH met the criteria again for a 72-hour hold and filed a new 72-hour notice of emergency detention under a new cause number. Callahan and the DCR then filed a 14-day petition for involuntary treatment, over a week after DH was initially detained. DH moved for dismissal of the petition "for a total disregard of the statutory requirements and rights set forth in Ch. 71.05 RCW" because he was held longer than 72 hours without a judicial determination. CP at 17, VRP at 46-47. The motion was heard on May 19, 2020—20 days after his initial detention.

In the ruling, the court noted, "[I]t's distressing that I do know I have more than one of these motions pending." VRP at 55. Nonetheless, the court denied the motion to dismiss, finding that there was not a total disregard for the statute, reasoning, "If there is any criticism of Wellfound in this case, it would be that they kept trying to honor his request to go on a voluntary status." *Id*.

5

*In re Detention of D.H.*, No. 100716-7

After further testimony as to DH's mental state, the court found that DH "suffer[s] from [a] mental disorder and that [he's] gravely disabled." VRP at 79. In doing so, the court granted the petition for a 14-day involuntary hold. The court then stated, "[Y]ou have now lost your right to possess a firearm or have a concealed weapons permit." *Id*. At no point prior to the ruling did the trial court inform DH that he would lose his right to possess firearms if he was involuntarily committed as required under former RCW 71.05.240(2) (2019).

DH appealed, alleging that the State had totally disregarded the requirements of the ITA and asking for the petition to be dismissed. In addition, for the first time on appeal, DH argued that the trial court erred when it did not give him the mandatory written and oral advisement that if he was involuntarily committed he would lose his right to possess firearms but that this could be avoided if he agreed to treatment voluntarily.

The Court of Appeals, Division Two, applied its recent test for whether the State has totally disregard the ITA as created in companion case, *In re Detention of N.G.*, 20 Wn. App. 2d 819, 503 P.3d 1 (2022). Under this test, the court looks to the totality of the circumstances, considering four factors:

> (1) whether the violation of the statutory requirements occurred knowingly, willfully or through gross negligence; (2) the extent of the deprivation of the committed person's liberty; (3) the extent to which the petitioner's conduct and the committed person's requested remedy are protective of the committed person's health and safety and reflect appropriate treatment for the committed person; and (4) the extent to

6

*In re Detention of D.H.*, No. 100716-7

> which the petitioner's conduct and the committed person's requested remedy are protective of the safety of the public.

*Id*. at 837. In considering these factors, the Court of Appeals held that "Wellfound did not willfully violate the ITA" but "tried in good faith to comply with the ITA in a situation not expressly covered by ITA provisions," that the "improper deprivation of liberty was relatively minimal," and that "immediate release would have posed a serious risk to public safety." *In re Det. of D.H.,* 20 Wn. App. 2d 840, 850, 502 P.3d 1284 (2022). The Court of Appeals then held the trial court did not abuse its discretion in ruling that any violation of the ITA did not constitute total disregard of the ITA.

As to the firearm advisement, although the Court of Appeals acknowledged that the State conceded that the trial court did not give the mandatory advisement, the court nonetheless declined to review the issue. The court held that this error was not "manifest" and therefore did not meet the RAP 2.5(a)(3) threshold of a "manifest error affecting a constitutional right." *Id*. at 851-52.[3]

DH appealed, and this court granted review, setting this case as a companion case to two consolidated cases, *In re Detention of A.C.*, No. 100668-3 (Wash. ___, 2023), and *In re Detention of N.G.*, No. 100690-0, that share the issue of the test of

---

[3] The Court of Appeals also held that there was sufficient evidence to support the trial court's factual finding that DH was gravely disabled. *In re Det. of D.H.*, 20 Wn. App. 2d at 853-54. DH did not appeal this issue.

7

*In re Detention of D.H.*, No. 100716-7

whether the State has totally disregarded the ITA requirements and, if so, what the proper remedy is. DH also appeals the failure to give the firearm loss advisement.

We accepted an amici brief in support of DH from the American Civil Liberties Union of Washington, Disability Rights Washington, King County Department of Public Defense, and Washington Defender Association.

ANALYSIS

I.    Background of the ITA and DH's Holds

In enacting the ITA, the legislature intends

> (a) To protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state;
>
> (b) To prevent inappropriate, indefinite commitment of persons living with behavioral health disorders and to eliminate legal disabilities that arise from such commitment;
>
> (c) To provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders;
>
> (d) To safeguard individual rights;
>
> (e) To provide continuity of care for persons with serious behavioral health disorders;
>
> (f) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; and
>
> (g) To encourage, whenever appropriate, that services be provided within the community.

RCW 71.05.010.

*In re Detention of D.H.*, No. 100716-7

Under former RCW 71.05.153(1), a DCR could order a person who, "as the result of a mental disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled," be taken into emergency custody for up to 72 hours, excluding weekends and holidays.[4] *See also* former RCW 71.05.180 (2019). Within this statute there were timelines related to steps that must be taken within the first 12 hours of an emergency detention. *See* former RCW 71.05.153(5). The statute set forth that by the end of the initial 12 hours, the DCR "must determine whether the individual meets detention criteria" and, if so, must file the detention petition. *Id*. After the DCR petitions for detention, "the facility shall then evaluate the person's condition and admit, detain, transfer, or discharge such person in accordance with [former] RCW 71.05.210." Former RCW 71.05.170 (2016).

Former RCW 71.05.210 set forth the procedures that must occur within the 72-hour detention for "[e]ach person involuntarily detained and accepted or admitted at an evaluation and treatment facility . . . ." Therefore, this statute applied to and set forth required timelines for all involuntary commitments, which would include those emergent 72-hour holds as set forth in former RCW 71.05.153. More specifically, the statute discussed requirements related to who must evaluate an involuntarily

---

[4] This statute has been amended to extend the time for an emergency hold from 72 hours to 120 hours. *See* RCW 71.05.153(1).

*In re Detention of D.H.*, No. 100716-7

detained person and in what time frame, mandated treatment and care, and allowed

for refusal of medication within 24 hours of an appearance before a judge. Former

RCW 71.05.210.

Further, the statutory scheme mandated that

[t]he person shall be detained up to seventy-two hours, if, in the opinion of the professional person in charge of the facility, or his or her professional designee, the person presents a likelihood of serious harm, or is gravely disabled. A person who has been detained for seventy-two hours *shall no later than the end of such period be released*, unless referred for further care on a voluntary basis, or detained pursuant to court order for further treatment as provided in this chapter.

Former RCW 71.05.210(1)(b) (emphasis added).

Former RCW 71.05.230 (2018) further authorized that a person under a 72-

hour hold could be involuntarily committed for up to 14 days if certain conditions

were met. "If a petition is filed for fourteen day involuntary treatment . . . , the court

shall hold a probable cause hearing within seventy-two hours of the initial detention

of such person as determined in RCW 71.05.180, or at a time determined under RCW

71.05.148." Former RCW 71.05.240(1).

Contrary to the mandatory directive under former RCW 71.05.210(1)(b), DH

was not released at the end of his initial 72-hour hold but was instead held overnight.

The following day he was evaluated again by a different DCR under a new cause

number, although relying on the same grounds as the first 72-hour hold.

*In re Detention of D.H.*, No. 100716-7

## II. Total Disregard of the ITA

This case concerns the interpretation of RCW 71.05.010(2)'s "totally disregarded" language and the proper remedy if a person's rights have been violated because of the State's total disregard of the ITA. Interpretation of the ITA is a question of law we review de novo. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). We review the trial court's application of the law to disputed facts for abuse of discretion. *In re Det. of A.C.*, No. 100668-3, at 7 (citing *State v. Sisouvanh*, 175 Wn.2d 607, 620, 290 P.3d 942 (2012)). We find an abuse of discretion when the trial court decision is manifestly unreasonable or exercised on untenable ground or for untenable reasons. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). This includes a decision reached "by applying the wrong legal standard." *Id*.

In interpreting a statute, "[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Campbell & Gwinn*, 146 Wn.2d at 9-10. To do so, we look to "all that the Legislature has said in the statute and related statutes." *Id*. at 11.

"Because civil commitment statutes involve a deprivation of liberty, they should be construed strictly." *In re Det. of C.W.*, 147 Wn.2d 259, 272, 53 P.3d 979 (2002). "However, courts must 'keep in mind the need to satisfy the intent of the

11

*In re Detention of D.H.*, No. 100716-7

statute while avoiding absurd results.'" *Id*. (quoting *In re Det. of Swanson*, 115 Wn.2d 21, 28, 804 P.2d 1 (1990)).

> Under RCW 71.05.010(2),
>
> When construing the requirements of this chapter the court must focus on the merits of the petition, *except where requirements have been totally disregarded*, as provided in *In re C.W.*, 147 Wn.2d 259, 281 (2002). A presumption in favor of deciding petitions on their merits furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment.

(Emphasis added). Under the plain language of the statute, the court focuses on the merits *except where* requirements have been totally disregarded. It follows that the merits of the petition is a wholly separate analysis from the analysis of whether the ITA has been totally disregarded.

The "totally disregarded" language comes from *Swanson*. In that case, this court looked at the 72-hour ITA hold and the timing of the required judicial hearing. *Swanson*, 115 Wn.2d at 26. Swanson's case was heard after the 72 hours had elapsed, but the court calendar had begun before the 72 hours had elapsed. In applying a strict construction of the ITA, and looking at the stated purposed of the ITA and the unpredictability of court calendars, the court held that the statute requires that the *calendar*, not the individual hearing, must have started before the 72-hour mark. *Id*. at 31. The court indicated that "[i]f Harborview had *totally disregarded the requirements of the statute* or had failed to establish legal grounds for Swanson's

12

*In re Detention of D.H.*, No. 100716-7

commitment, *certainly dismissal would have been proper. Indeed, it would have been required.*" *Id.* (emphasis added). "However, if the intent of the statute is to be fulfilled and absurd results are to be avoided, dismissal cannot turn on the vagaries of scheduling, especially in these unpredictable and sensitive proceedings." *Id.* This court reiterated that time limits under the ITA must be strictly construed. *Id.* However, we nonetheless held that

> in the civil commitment context, a hearing begins when the court calendar begins and the parties' attorneys are ready to proceed. We take care to note, however, that our holding is expressly limited to this context, recognizing that it rests upon, and is guided by, the stated intent of the civil commitment statute.

*Id.*

In *C.W.*, 147 Wn.2d 259, this court looked at the violation of a different ITA time limit under RCW 71.05.050. The court ultimately concluded that dismissal can be a proper remedy when the State totally disregards statutory requirements of the ITA. *See id.* at 283 ("allowing dismissal in cases where the professional staff totally disregarded the statutory requirements serves as a general safeguard against abuse"). However, we also concluded that "*Swanson* does seem to suggest that in determining whether a case is to be dismissed, courts should focus on the merits of the petition, the intent of the statute, and whether the State 'totally disregarded the requirements of the statute.'" *Id.* at 281 (quoting *Swanson*, 115 Wn.2d at 31). Again, this would

13

imply that the determination of the merits of the petition is a separate analysis from whether the requirements have been totally disregarded.

As set forth above, the legislature then codified the "totally disregarded" language and indicates that courts must focus on the merits of the petition as set forth in *C.W.*, *except* when the requirements of the ITA have been totally disregarded. LAWS OF 2015, ch. 269, § 1; RCW 71.05.010(2). The legislature has given no direction on what constitutes a total disregard of the ITA requirements, nor does it define "totally" or "disregarded." Therefore, we look to dictionary definitions to discern their meaning. *Nissen v. Pierce County*, 183 Wn.2d 863, 881, 357 P.3d 45 (2015).

"Disregard" means "to treat without fitting respect or attention," "to treat as unworthy of regard or notice," and "to give no thought to : pay no attention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 655 (2002). Whereas "totally" means, "in a total manner : COMPLETELY, WHOLLY." *Id*. at 2415. Analogizing to the "admittedly very different context of negligent homicide," our companion case recognizes that we have held, "'To drive with disregard for the safety of others, consequently, is a greater and more marked dereliction than ordinary negligence. It does not include the many minor inadvertences and oversights which might well be deemed ordinary negligence under the statutes.'" *A.C.*, No. 100668-3, at 14 (quoting *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967)).

*In re Detention of D.H.*, No. 100716-7

Relying on these definitions and analogous reasoning, it follows that total disregard is not a mere oversight but amounts to a complete failure to treat the ITA with respect or attention. Holding someone without authority of law cannot be acceptable under the ITA, and a failure to follow those mandatory directives to ensure there is authority of law to involuntarily detain someone amounts to a complete failure to treat the ITA as worthy of attention. Therefore, consistent with the majority in *A.C.*, we hold that "the requirements of the ITA have been totally disregarded when a person is involuntarily detained without legal authority under the act." *A.C.*, No. 100668-3, at 14.[5] Further, "[t]he requirements of the ITA are not totally disregarded in every case where some aspect of the act has been violated." *Id*. at 14-15. When the State totally disregards the ITA, the remedy is dismissal. *Id*. at 13 (citing *Swanson*, 115 Wn.2d at 31).

Turning to the facts in the present case, the applicable statute reads, "[a] person who has been detained for seventy-two hours *shall no later than the end of such period be released*, unless referred for further care on a voluntary basis, or detained pursuant to court order for further treatment as provided in this chapter." Former RCW 71.05.210(1)(b) (emphasis added). At the end of the 72-hour hold, because treatment providers deliberately failed to file a petition for a 14-day hold,

---

[5] As the majority in *A.C.* also observes, this holding is not intended to describe the only way in which the ITA can be totally disregarded but instead is focusing on the specific facts surrounding DH's detention.

15

and because DH did not agree to voluntary treatment, the *only option* was to release DH at or before 9:58 p.m., on Monday, May 4, 2020. Wellfound's willful failure to follow the statute is problematic and constitutes a total disregard of the ITA.

The dissent contends that the applicable statute is not former RCW 71.05.210(1)(b) but rather former RCW 71.05.153. This is incorrect. While it is true that DH was detained and taken to Allenmore under the authority of former RCW 71.05.153, this statute applies only until the detained person has been evaluated and a DCR has made the determination as to whether the person meets the criteria for detention and files the detention petition. Under former RCW 71.05.170, once the DCR files a detention petition, the facility must follow the directives in former RCW 71.05.210. In the present case, the petition for initial detention is dated April 29, 2020. CP at 30-32. From that point forward, DH's detention was governed by former RCW 71.05.210, not former RCW 71.05.153.

In addition, former RCW 71.05.153(5) does not apply because the timeliness requirements within the statute do not concern release. Instead, the timeliness requirements refer to the time by which one must be examined by medical professionals and the time by which medical professionals must determine if the person meets criteria for involuntary detention. While former RCW 71.05.153 mentions that a person cannot be held for more than 72 hours, former RCW

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

71.05.210(1)(b) concerns what happens when the 72 hours elapses and is therefore

the appropriate statute under which to analyze this case.

However, even if former RCW 71.05.153(6) applied, we would come to the

same conclusion. Former RCW 71.05.153(6) reads,

> Dismissal of a commitment petition is not the appropriate remedy for a violation of the timeliness requirements of this section based on the intent of this chapter under RCW 71.05.010 *except in the few cases where the facility staff or designated mental health professional has totally disregarded the requirements of this section.*

(Emphasis added.) Therefore, even if this statute were to control, it contains

language that dismissal is not appropriate *unless* the requirements have been totally

disregarded, as we conclude they have been here.

The Court of Appeals makes much of the fact that the voluntariness of DH's

commitment was in question, but it is not as questionable as the Court of Appeals

concludes. DH was evaluated for a 14-day hold on Thursday, April 30, the day after

his admission, and the evaluator chose not to file the 14-day order because DH

agreed to go voluntarily. Nonetheless, the evaluator had him transferred to

Wellfound on the 72-hour hold, and the paper work indicated that the intake and

transfer was as an involuntary patient. Almost immediately upon arrival at

Wellfound later that day, on April 30, DH indicated that he wanted to leave. That

DH agreed to treatment and only hours later changed his mind and indicated his

desire to leave does not make the time requirements of the ITA evaporate or make

*In re Detention of D.H.*, No. 100716-7

them any less mandatory. Wellfound arguably lost a few hours when DH said he would go voluntarily, but, due to the weekend, the hospitals had five days to comply with the requirements of the ITA. Not so much time was lost that Wellfound could not have, at the very least, attempted to comply with the statutory requirements to the best of its ability. Instead, Wellfound chose to let the time expire and to hold DH without authority of law and then began new proceedings under which he was held for weeks before being heard on the merits before a judge. As required by statute, DH should have been released before commencing a new petition.

The State contends that because the second 72-hour hold was done under a new cause number and because there are no violations as to the current detention, there is no basis to dismiss this current petition. Suppl. Br. of Resp't at 13. However, we cannot allow the State to hold people without authority of law and avoid repercussions simply by starting a new case. The new filing is materially indistinguishable from the original, and so we will not treat it as a new petition. Further, the filing of a new petition does nothing to remedy that the new case was not allowed to be filed under the statute as the option for a new petition after the 72-hours is filing a 14-day hold, not filing a consecutive 72-hour hold. Nor does a new petition remedy that DH was held overnight without authority of law when the treatment providers deliberately failed to pursue a 14-day order and that the only

18

*In re Detention of D.H.*, No. 100716-7

option available under the statute at the end of the 72-hour hold was for DH to be released.

The trial court abused its discretion when it held that the State did not totally disregard the requirements of the ITA under the facts of this case. The trial court should have granted DH's motion to dismiss.

Because we reverse the Court of Appeals and hold that DH's motion to dismiss should have been granted, we decline to reach the issue of whether the failure to give him the statutorily mandated firearm rights advisement is reviewable under RAP 2.5(a)(3).

CONCLUSION

We reverse the Court of Appeals. The State totally disregarded the requirements of the ITA when it intentionally allowed DH's emergency hold to expire, held him overnight without authority of law, and began new proceedings on the same grounds as the initial petition without releasing him as mandated by statute. When the State totally disregards the requirements of the ITA, the petition must be dismissed. We therefore remand to the trial court for dismissal of the petition and any other proceedings necessary consistent with this opinion.

Whitener, J.

WE CONCUR.

González, C.J.

Gordon McCloud, J.

Yu, J.

Montoya-Lewis, J.

*In re Det. of D.H.*

No. 100716-7

MADSEN, J. (dissenting)—The involuntary treatment act (ITA) states that the requirements of the chapter must be construed such that petitions are decided on the merits, "except where requirements have been *totally disregarded*." RCW 71.05.010(2) (emphasis added). The legislature adopted the phrase "totally disregarded" from a decision of this court, *In re Detention of C.W.*, which provides that dismissal is not an appropriate remedy for every violation but "may be appropriate *in the few cases* where [providers] 'totally disregarded the requirements of the statute.'" 147 Wn.2d 259, 283, 53 P.3d 979 (2002) (emphasis added) (quoting *In re Det. of Swanson*, 115 Wn.2d 21, 31, 804 P.2d 1 (1990)). Here, the majority agrees with the holding of its companion case, *In re Detention of A.C.*, No. 100668-3 (Wash. ____, 2023), to conclude that a total disregard occurs when a person is involuntarily detained without legal authority under the ITA, requiring dismissal. Majority at 14-15. I disagree.

I would hold that ITA requirements are totally disregarded only when the action or inaction complained of thwarts the fundamental purposes of the act. Here, dismissal is

No. 100716-7
Madsen, J., dissenting

not warranted, and instead, the remedy is filing a new commitment petition as was done in this case. More importantly, regardless of how "totally disregarded" is defined, the statute under which D.H. was detained expressly states that "[d]ismissal of a commitment petition *is not the appropriate remedy* for a violation of the timeliness requirements of this section." Former RCW 71.05.153(6) (2019) (emphasis added).

I would also affirm the Court of Appeals' decision not to address the trial court's failure to advise D.H. that involuntary commitment would result in the loss of his firearm rights. I respectfully dissent.

## DISCUSSION

The meaning of a statute is a question of law reviewed de novo. *State v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). A court's fundamental objective is to ascertain and carry out the legislature's intent. *Id.* at 9-10. If the statute's meaning is plain, then we give effect to that plain meaning as an expression of legislative intent. *Id.* at 10. Plain meaning is derived from what the legislature has said in the statute, related statutes, and context of the statutory scheme as a whole. *Id*. at 11; *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Absent a specific statutory definition, words in a statute are given their ordinary meaning and we may discern that meaning from the dictionary. *State v. Chester*, 133 Wn.2d 15, 22, 940 P.2d 1374 (1997); *State v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010). Washington's civil commitment statutes involve a deprivation of liberty, therefore, they should be strictly construed. *C.W.*, 147 Wn.2d at 272. But courts must also "'keep in mind the

2

No. 100716-7
Madsen, J., dissenting

need to satisfy the intent of the statute while avoiding absurd results.'" *Id.* (quoting *Swanson*, 115 Wn.2d at 28).

"Totally Disregarded"

Subsection (2) of RCW 71.05.010 provides the language at issue: "When construing requirements of this chapter the court must focus on the merits of the petition, except where requirements have been *totally disregarded*, as provided in *In re C.W.*" (Emphasis added.) The ITA does not define "totally disregarded." Nevertheless, we have guidance from the dictionary and our decision in *C.W.*

First, *Webster's* defines the verb to "disregard" as "to treat without fitting respect or attention," "to treat as unworthy of regard or notice," and "to give no thought to **:** pay no attention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 655 (2002). The word "totally" is defined as "in a total manner **:** COMPLETELY, WHOLLY," and the word "total" is defined as "unqualified in extent or degree **:** ABSOLUTE, UTTER." *Id.* at 2414-15. Together, the terms "totally disregarded" mean to treat something as utterly or wholly unworthy of regard or notice. Under chapter 71.05 RCW, the ITA is totally disregarded when it is treated as wholly unworthy of respect or notice.

Next, we know from our decision in *C.W.* that if provisions of the act are violated, the court should "focus on the merits of the petition, the intent of the statute, and whether the State 'totally disregarded the requirements of the statute'" when fashioning a remedy. 147 Wn.2d at 281 (quoting *Swanson*, 115 Wn.2d at 31). Here, the majority rejects the guidance from both *Webster's* and our case law.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Rather than adopting the terms' plain meaning from *Webster's*, the majority agrees

with its companion case, *A.C.*, analogizing "disregard" to the mental state of negligent

homicide—a "'more marked dereliction than ordinary negligence.'" *A.C.*, No. 100668-3,

at 14 (quoting *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967)).[1]  While I

disagree that *C.W.*'s total disregard standard includes a mental element, "totally

disregard" surely means more than the majority's "enhanced" negligence standard.

The majority also rejects *C.W.* in defining the standard set by that case, and

instead asserts that "the merits of the petition is a wholly separate analysis from the

analysis of whether the ITA has been totally disregarded."  Majority at 12.  In *C.W.*, we

explained that "in determining whether a case is to be dismissed, courts should focus on

the merits of the petition, the intent of the statute, *and* whether the State 'totally

disregarded the requirements of the statute.'"  147 Wn.2d at 281 (emphasis added)

(quoting *Swanson*, 115 Wn.2d at 31).  Releasing an individual who is in need of

_____

[1] While the majority says it is not adopting this "negligence-plus" standard, its acceptance of the analogy from *A.C.* does little to alleviate the confusion of what total disregard means.  In accepting the "analogous reasoning" of negligence plus, the majority appears to create an intent requirement for the "total disregard" standard.  Majority at 14.  The majority reasons that Wellfound Behavioral Health Hospital "intentionally" allowed the 72-hour hold to expire and "deliberately failed to pursue a 14-day order."  Majority at 18, 15.  But under either a negligence or intentional standard, Wellfound's actions did not demonstrate a total disregard for the act.  D.H. told hospital staff that he wanted to leave immediately after arriving at Wellfound, contrary to D.H.'s earlier statement accepting voluntary treatment.  Upon discovering that no 14-day involuntary petition had been filed for D.H., Wellfound staff sought guidance from the Pierce County Prosecutor's Office.  On that advice, the staff knowingly allowed D.H.'s original 72-hour hold to elapse.  Sealed Verbatim Rep. of Proc. at 29, 35.  These actions are far from "the very least, attempt[ing] to comply with the statutory requirements to the best of [Wellfound's] ability."  Majority at 18.  Rather, Wellfound was attempting to comply with ITA requirements, even seeking legal advice.

No. 100716-7
Madsen, J., dissenting

behavioral health treatment without regard for their provider's reasoning contained in the petition conflicts with the "tacit presumption" of the ITA—to decide cases on the merits in order to further the well-being of individuals and public safety. *In re Det. of G.V.*, 124 Wn.2d 288, 296, 877 P.2d 680 (1994).[2]

The presumption that petitions be decided on their merits furthers public and private interests because releasing an individual who is in need of treatment implicates the well-being of those individuals as well as public safety. RCW 71.05.010(2). These dual purposes are reflected in the legislative intent of the ITA: to protect the health and safety of persons suffering from behavioral health disorders and protecting public safety; preventing inappropriate and indefinite commitments; providing prompt evaluation and timely and appropriate treatment; safeguarding individual rights; providing continuity of care; and encouraging full use of existing agencies, personnel, and public funds to prevent duplication of services. RCW 71.05.010(1)(a)-(f).

Considering these purposes, dismissal should be used only in those few cases where the action or inaction complained of totally disregards the fundamental purposes and intent of the ITA. *See C.W.*, 147 Wn.2d at 283. This standard considers the

---

[2] Contrary to the majority's assertion, it does not follow that reviewing the merits of a petition is separate from determining whether the ITA has been totally disregarded. Majority at 12. RCW 71.05.010(2) states that courts must focus on the merits of a petition except when the ITA has been totally disregarded as provided in *C.W.*, 147 Wn.2d at 281. *C.W.* lists, as factors to be considered for purposes of dismissal, the merits of a petition, the intent of the ITA, and whether the act's requirements have been totally disregarded. 147 Wn.2d at 281. Thus, *C.W.* does not support the majority's narrow and out-of-context interpretation of .010(2). Together, .010(2) and *C.W.* support a court considering all three factors when the remedy sought is dismissal.

5

No. 100716-7
Madsen, J., dissenting

presumption in favor of deciding petitions on the merits, the goals of the ITA, and

whether the requirements of the ITA have been treated as wholly unworthy of respect or

notice.[3]

Dismissal Is "Not the Appropriate Remedy" for Violating Timeliness
Requirements, RCW 71.05.153(5)

Setting aside, for the moment, the definition of "totally disregarded," former RCW

71.05.153(6) (2019) says that "[d]ismissal of a commitment petition *is not the*

*appropriate remedy* for a violation of the timeliness requirements of this section based on

the intent of this chapter under RCW 71.05.010 except in the few cases" where the

requirements of the section were "totally disregarded." (Emphasis added.)[4] Here, the

designated crisis responder found that D.H. was gravely disabled and took D.H. into

*emergency* custody on April 29, 2020, which is authorized by RCW 71.05.153. Sealed

---

[3] In examining whether the action or inaction complained of disregards the fundamental purposes and intent of the ITA, it may be appropriate to consider some of the factors outlined by the Court of Appeals. These factors may include the extent to which the petitioner's conduct and the committed person's requested remedy safeguard the committed person's health and safety, ensure appropriate treatment, and are protective of public safety. Other considerations may be whether the petitioner has a process in place to comply with statutory requirements; the extent to which the petitioner attempted to comply with that process; and the actions of the petitioner upon discovering a statutory violation—which concern the safeguarding of individual rights. *See* Suppl. Br. of N. Sound Telecare E&T Ctr. at 16 (Wash. No. 100668-3 (2022)); RCW 71.05.010(1)(d). Relevant considerations should reflect the legislative intent of the ITA as set out in RCW 71.05.010(1).
[4] RCW 71.05.153 was subsequently revised, resulting in subsection (6) becoming subsection (5) in the current provision. The legislature has not changed the language expressing its intent that dismissal "is not the appropriate remedy for a violation of the timeliness requirements of this section." RCW 71.05.153(5).

6

No. 100716-7
Madsen, J., dissenting

Clerk's Papers (CP) at 40. That statute governs the procedure for emergency detentions of persons with behavioral health disorders, providing:

> When a designated crisis responder receives information alleging that a person, as the result of a mental disorder, presents an imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled, after investigation and evaluation of the specific facts alleged . . . the designated crisis responder may take such person . . . into emergency custody . . . for *not more than seventy-two hours* as described in RCW 71.05.180.[5]

Former RCW 71.05.153(1) (2019) (emphasis added). The majority mentions subsection (6), the legal basis for the commitment but, instead, relies on former RCW 71.05.210(1)(b) (2019): "'A person who has been detained for seventy-two hours shall no later than the end of such period be released, unless referred for further care on a voluntary basis, or detained pursuant to court order.'" Majority at 10 (quoting former RCW 71.05.210(1)(b)). While former .210 discusses the 72-hour hold, *D.H. was not detained under that provision*. D.H. was taken into emergency custody and transferred to Wellfound Behavioral Health Hospital pursuant to former .153. CP at 40. Relying on former .210 for the mandatory release language, as the majority does here, disregards the statutory authority under which D.H. was detained and ignores that provision's express direction that violations of its timeliness requirements *do not* warrant dismissal of a commitment petition.[6]

---

[5] RCW 71.05.180 states that computation of RCW 71.05.153's emergency detention time period excludes Saturdays, Sundays, and holidays.

[6] The majority explains that it is relying on former .210 because that provision provides the procedure for what must occur within and after a 72-hour detention. Majority at 9-10, 16-17.

7

No. 100716-7
Madsen, J., dissenting

Indeed, former RCW 71.05.153(6) resolves this matter. It is true that D.H. was held over the 72-hour commitment period, violating the statute's timeliness requirements. But, the legislature expressed its clear intent that such violations do not result in dismissal except in the few cases where the requirements of the section have been totally disregarded. Former RCW 71.05.153(6). Thus, "total disregard" must mean something other than violations of the timelines in .153.

Instead of considering the provision under which D.H. was detained, the majority concludes that the ITA has been "totally disregarded" under former RCW 71.05.210(1)(b). Majority at 15. But even if that section controlled, this misses the point.

---

The subsequent actions of a facility are, as the majority notes, governed by former .210. But the question before us is whether authority of law exists to detain someone, which the majority agrees is the issue, and former .210 does not answer that question. The majority concludes, contrary to former .210(1)(b), D.H. was not released at the end of his initial 72-hour hold but instead held overnight, which means the ITA has been totally disregarded. Majority at 16. Failure to release after 72 hours may violate former .210, but that does not mean the detention lacked all legal authority under the ITA. The majority merely identifies a statutory violation. The majority also dismisses former .153 by saying it "mentions" a person cannot be held for more than 72 hours but only *.210* deals with what happens when the 72-hour period is up. Majority at 16-17. In other words, .210 requires a patient to be released. Yet both former .153 and former .210 set a 72-hour timeline, and .153 alone provides emergency detention authority. The majority essentially holds that *any* and *all* violations of the ITA are now a total disregard of the statute. That cannot be the test. Moreover, the existence of another statute that outlines other procedures does not supplant the provision enabling the involuntary detention in the first place. Instead of reconciling the two statutes, the majority circumvents the controlling statute—former RCW 71.05.153 and its presumption against dismissal—by simply selecting former .210 as applicable and interpreting that provision. *See Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155 (2006) (reviewing courts cannot rewrite unambiguous statutory language under the guise of interpretation).

8

No. 100716-7
Madsen, J., dissenting

There is no dispute that the 72-hour emergency period expired and D.H. was held over in violation of the ITA. The question before us is whether dismissal is the appropriate remedy. It is not. Where a person is still in need of treatment, is receiving treatment, and is appropriate for a new commitment period, the failure to timely refile for a new commitment period is not a "total disregard" of the purposes of the ITA meriting dismissal. *See* RCW 71.05.010(2); former RCW 71.05.153(6) (2019).

Even under the Majority's Definition of "Totally Disregarded," the Remedy of Dismissal to the Subsequent, Properly Filed Petition Is Improper

The majority elects to apply its dismissal remedy, not to the initial petition on which D.H. was held over but to the second, properly filed petition. The parties do not assert that new petitions for evaluation and treatment are precluded by prior ITA violations. The ITA permits the use of a person's recent history to determine whether that person should be civilly committed, that is, whether they are gravely disabled, present a likelihood of serious harm, or are in need of treatment. RCW 71.05.245(1). This history can include violent acts and, relevant here, "recent history of one or more commitments" under the ITA or equivalent provisions in another state. RCW 71.05.245(3)(a)-(b). Consideration of past commitments, irrespective of whether those commitments included ITA violations, aligns with the ITA's intent. It furthers the goals of protecting persons with behavioral health disorders based on their current behavior and recent history, which also aids in preventing inappropriate commitments. RCW 71.05.010(1)(a), (b).

9

No. 100716-7
Madsen, J., dissenting

In light of these provisions, I disagree with the majority's decision to treat D.H.'s new commitment petition (filed after the original 72-hour hold elapsed) as "indistinguishable" from the prior filing for purposes of dismissal. Majority at 18.[7] In order to detain a person for involuntary treatment, a designated crisis responder must conduct an evaluation. RCW 71.05.153(1). The crisis responder must make a point-in-time determination of whether a person, as a result of a behavioral health disorder, presents an "imminent likelihood of serious harm, or is in imminent danger because of being gravely disabled." *Id*. The fact that a person is in continuing need of treatment due to a continuing behavioral health disorder does not make a new petition, when conducted in accordance with the ITA as was done here, legally the same as a prior petition.

It is clear that D.H. could be released and immediately detained for involuntary commitment if D.H. met the criteria. *See* Wash. Sup. Ct. oral argument, *In re Det. of D.H.*, No. 100716-7 (Oct. 6, 2022), at 17 min., 35 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2022101094/. These new commitment proceedings could properly include the individual's most recent commitment history under RCW 71.05.245. While the majority's holding would provide D.H. with liberty, it is a fleeting liberty. Apparently, the majority would have mental health providers wait at the door for D.H.,

---

[7] Unlike the majority in *A.C.*, the majority here recognizes that it is applying its dismissal remedy to a new, properly filed commitment petition.

10

No. 100716-7
Madsen, J., dissenting

who was clearly in need of continued treatment, to be released and then refile for D.H.'s continued detention. The majority's solution is an empty remedy.

Even if the majority's test for total disregard is correct—that a person is detained without authority of law—it should not apply in this case. Here, the mental health provider for D.H. filed a *new* commitment petition when the original hold expired. D.H. does not argue that new petitions could not be filed. The majority applies its rule not just to the previously expired petitions but to the *new* petitions as well, attaching not only to actions taken without "authority of law" but to actions that are wholly compliant with the ITA.

Instead, the remedy of commencing a new petition while an individual is detained is sensible and does not undermine the ITA's goal of preventing indefinite commitments. The commencement of new petitions involves numerous safeguards. Designated crisis responders file petitions only after they determine the person meets the criteria for civil commitment. RCW 71.05.150, .153. Holding a person past the expiration of their original commitment orders does not create indefinite commitments. That individual is entitled to multiple reviews of their current mental and behavioral status, from the designated crisis responder to a judicial officer. At each point in this process, the detained individual must be found to meet criteria for continued commitment or be released. *E.g.*, RCW 71.05.260 (mandating release if a professional determines the person no longer meets criteria for detention). The individual's need for treatment drives the process, which requires additional safeguards as the potential commitment period

11

No. 100716-7
Madsen, J., dissenting

becomes longer. *In re Det. of E.S.*, 22 Wn. App. 2d 161, 179, 509 P.3d 871 (2022) ("The act is intended to be applied 'in stages,' with increasing terms of involuntary treatment and detention to be accompanied by increasing procedural protections." (quoting *In re Det. of Dydasco*, 135 Wn.2d 943, 947, 959 P.2d 1111 (1998))).

In civil commitment cases, courts must balance the interests of the detained person with the interests of the State, as detailed in the ITA. *See C.W.*, 147 Wn.2d at 281. When persons are in obvious need of behavioral health services and pose serious risks of harm to themselves or others, like the individual in this case, the ITA's purpose counsels continued detention for treatment rather than release. Release without regard for the individual's needs and safety or that of the public conflicts with the foundational purposes of the ITA.

        D.H.'s Hold-Over Detention Did Not Totally Disregard the ITA

On April 29, 2020, D.H.'s mother referred D.H. for an involuntary treatment evaluation, with concerns about D.H.'s labile mood, delusions, threats toward D.H.'s family, and lack of sleep. D.H. was reportedly acting out and speaking incoherently, "obsessed with his family being imposters and the CIA." CP at 30. The designated crisis responder concluded that D.H. exhibited symptoms of mania and delusions, a labile and anxious mood, agitated behavior, disorganized thought process, and impaired judgment among other things, meeting the criteria for grave disability. D.H. was brought to Allenmore Hospital on a 72-hour hold under former RCW 71.05.153(1).

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100716-7
Madsen, J., dissenting

The next day, April 30, 2020, D.H. was evaluated by another crisis responder for an additional 14 days of treatment. The responder found that D.H. was calm and oriented, and would accept voluntary treatment. Therefore no 14-day petition was filed. D.H. was transferred to Wellfound as an involuntary patient for the remaining hours of the original 72-hour hold.

Upon arriving at Wellfound, D.H. informed staff that he wanted to leave. Wellfound staff were unsure how to proceed. They consulted the Pierce County Prosecuting Office, concluding that Wellfound had to allow the current 72-hour hold to elapse and continue to engage D.H. in voluntary treatment services in the hope that D.H. would stay voluntarily or stabilize. D.H.'s 72-hour hold expired on Monday, May 4, 2020, and Wellfound continued to detain D.H.

On May 5, 2020, D.H. was evaluated by another designated crisis responder, who imposed a second 72 hour emergency hold. Later that week, Wellfound filed a 14-day involuntary treatment petition for D.H. At the hearing for that petition, D.H. moved to dismiss for total disregard of the ITA's 72-hour time period. The court denied D.H.'s motion and committed D.H. for the additional 14 days.

Detaining D.H. past the original 72 hours was not a total disregard of the ITA, neither under the plain language of RCW 71.05.153(5) nor when considering the intent and purpose of the act. D.H.'s delusions centered on family members: at the April 30, 2020 evaluation, D.H. stated, "I'm sure my mother and b[r]other poisoned me and people are pretending to be people I know." CP at 55. D.H. has a history of unspecified

13

No. 100716-7
Madsen, J., dissenting

schizophrenia and psychotic disorders. Those disorders worsened due to substance use and COVID-19 (coronavirus disease 2019) stress. D.H.'s conversation with the crisis responder indicated delusional thinking—D.H. reported his family and friends were replaced by strangers out to get D.H., his body parts were replaced by other people's body parts, D.H. was in a coma, and the world was virtual. D.H. used cannabis every day and smoked cigarettes but believed that they were fake because people put "in other drugs to poison" D.H. *Id.* at 56. D.H. was sleeping poorly, had little appetite, and poor concentration.

In light of D.H.'s delusions and statements, D.H.'s mental health provider recommended continued hospitalization in order to protect the safety of D.H.'s family. D.H. was dangerous to others, had homicidal ideation, and was not safe to be discharged.

Continuing to detain D.H. protected the health and safety of the general public, specifically D.H.'s mother with whom D.H. lived and whom he had threatened. RCW 71.05.010(1)(a). Immediately commencing new commitment procedures when the 72-hour hold expired prevented inappropriate and indefinite commitment, and provided prompt evaluation and appropriate treatment by recalling a designated crisis responder for a new evaluation and subsequent judicial oversight. RCW 71.05.010(1)(b)-(c). It also ensured continuity of care, allowing providers familiar with D.H. to continue treatment. *See* RCW 71.05.010(1)(e).

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100716-7
Madsen, J., dissenting

Loss of Firearm Rights

As to D.H.'s argument that the failure to advise him of the potential loss of his firearm rights, I would affirm the Court of Appeals' ruling that the issue is not manifest under RAP 2.5(a)(3). *In re Det. of D.H.*, 20 Wn. App. 2d 840, 850-51, 502 P.3d 1284 (2022). The State concedes that at the beginning of the 14-day probable cause hearing, D.H. was not provided with the statutorily required notice that his firearm rights would be lost if he was involuntarily committed. RCW 71.05.240(2); Suppl. Br. of Resp't at 30. D.H. did not object at the hearing. D.H. later raised the issue for the first time at the Court of Appeals, arguing the statutory violation requires reversal of the 14-day detention order.

Under RAP 2.5(a)(3), a claim of error may be raised for the first time on appeal if it involves a manifest error affecting a constitutional right. The issue affected D.H.'s constitutional right to bear arms. U.S. CONST. amend. II; WASH. CONST. art. I, § 24. An error is manifest if the appellant makes a plausible showing that the error had "'practical and identifiable consequences.'" *State v. A.M.*, 194 Wn.2d 33, 38, 448 P.3d 35 (2019) (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). RAP 2.5(a)(3)'s requirements are distinct from the requirements for establishing an actual violation of a constitutional right or for showing a lack of prejudice for harmless error if a violation of a constitutional right has occurred. *Id.* at 39.

In D.H.'s case, the Court of Appeals held the error was not manifest on three grounds. *D.H.*, 20 Wn. App. 2d at 852. First, evidence indicated that D.H. knew he

15

No. 100716-7
Madsen, J., dissenting

would lose his firearm rights if involuntarily committed even though the court did not inform him at the 14-day hearing. The 14-day petition stated that D.H. had been informed of the loss of firearm rights, which D.H. did not deny. The record also shows that D.H. had been committed in October 2019 and, presumably, D.H. was advised at the time that he had lost his firearm right due to involuntary commitment. *Id.*

Second, the record indicates that D.H. would not have agreed to voluntary treatment even if he had been advised of the loss of his firearm rights. As discussed above, D.H. had agreed to voluntary treatment but, upon transfer to Wellfound, decided he did not want treatment and wished to leave. D.H. continued to decline treatment throughout his 72-hour hold as the staff attempted to stabilize him. *Id.*

Finally, the Wellfound staff testified that D.H. did not own firearms, and there was no indication that the loss of those firearm rights would have influenced D.H.'s decision to accept voluntary treatment to maintain his rights. *Id*. at 852-53.

D.H. argues that it was possible that the trial court's failure to inform him of the loss of his firearm rights would have "practical and identifiable consequences," but D.H. does not show that error was *plausible* as RAP 2.5(a)(3) requires. Accordingly, I would uphold the Court of Appeals' ruling on this issue.

                                    CONCLUSION

The majority adopts a bright-line rule that dismissal of new commitment petitions is required if individuals were detained under the ITA without authority of law in previous petitions. Our case law and the ITA itself do not require such a rule. Instead,

16

No. 100716-7
Madsen, J., dissenting

we should consider whether the action or inaction complained of prevents the

fundamental purposes of the ITA when determining whether the act's requirements have

been totally disregarded. *See* RCW 71.05.010(2). I would hold that the continued

detention of D.H. was not a total disregard of the ITA and that dismissal was not the

appropriate remedy.[8] Regarding the firearm warning, I agree with the Court of Appeals

that the issue was not manifest under RAP 2.5(a)(3) and would not reach it for the first

time on appeal.

 With these considerations in mind, I respectfully dissent.

                          Madsen, J.

                          Johnson, J.

                          Owens, J.

                          Stephens, J.

---

[8] While dismissal is a remedy to be rarely used, persons held over their commitment periods are not without recourse. Relevant here, detention "for more than the allowable number of days" can result in civil damages. RCW 71.05.510. As the State details in *A.C.*, other remedies may be sought such as 42 U.S.C. § 1983 actions, habeas corpus or personal restraint petitions, and professional discipline for providers who fail to abide by the ITA. Unlike dismissal, these remedies better serve the legislative intent to focus on the merits of the petition, the needs and safety of the individual, and the safety of the public.