# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>A.V. | DIVISION ONE<br><br>No. 85686-3-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — A.V. appeals from the orders of the superior court denying her motion to dismiss a 14-day involuntary commitment petition and entering an order granting that petition. On appeal, A.V. contends that the superior court erred because those orders were predicated on an initial detention petition by a designated crisis responder who, according to A.V., totally disregarded certain documentation requirements set forth in a provision of the involuntary treatment act (ITA).[1] Because the record supports that the designated crisis responder in this matter did not totally disregard the requirements of the provision at issue, we disagree. Accordingly, we affirm.

I

The facts of this matter are undisputed. On July 28, 2023, Cecile Sharp, a designated crisis responder (DCR), filed a petition seeking to initially detain A.V.

---

[1] Ch. 71.05 RCW.

due to A.V.'s alleged behavioral health disorder and substance abuse.[2]  In the

petition, Ms. Sharp detailed that A.V. was brought to her attention under the

following circumstances:

> [A.V.] is a 22-year-old, Caucasian, single, transient woman with a
> history of untreated Bipolar Disorder and Substance Use Disorder
> (Methamphetamine).  On 7/27/23, [A.V.] was found in a shed on
> private property by the property owner in Oak Harbor who called
> law enforcement when he found [A.V.] using drugs and drinking
> alcohol in his shed.  [A.V.] was arrested for tresspass [sic], but
> because she is listed as a missing person in Skagit County with an
> active [Designated Crisis Responder (DCR)] Custody Authorization
> filed with the Skagit County Sheriff's office, she was transported to
> Skagit Hospital for medical clearance and [Designated Crisis
> Responder] evaluation.
>
> There are three affidavits from law enforcement (attached) about
> [their] recent interaction with [A.V.].  She was found disoriented,
> confused, responding to internal stimuli and childlike.  She was
> wearing a thin nightshirt with her torso fully exposed and
> unconcerned about her modesty.
>
> [A.V.'s] tox[icology] screens are positive for Methamphetamnie [sic]
> and negative for [ethyl alcohol].  She has refused medical treatment
> for open sores on her body.
>
> [A.V.] has a history of at least four ITA [detentions] and has
> escaped from several facilities stealing key cards, was found
> nearby being victimized (raped) in a[n] alley by two men.  [A.V.]
> continues to be a vulnerable adult with interrupted cognitive
> development due to severe drug use and untreated mental health
> conditions.  It has taken a coordinated effort on behalf of the mental
> health community, law enforcement, the [B]ehavioral [sic] [H]ealth
> [Administrative Service Organization (ASO)] and Telecare
> community to find and bring her back to treatment.
>
> When she was released from her last 120-hour hold on 6/28/2023,
> it is reported that within two hours, [A.V.] had eloped from her

---

[2] A "[d]esignated crisis responder" as defined by the ITA, is "a mental health professional appointed by the county, by an entity appointed by the county, or by the authority in consultation with a federally recognized Indian tribe or after meeting and conferring with an Indian health care provider, to perform the duties specified in this chapter."  RCW 71.05.020(17).

mother's home, stolen alcohol from a mini-mart and began using meth within two hours.

In speaking to [A.V.'s] mother, . . . she tells this writer that [A.V.] had overdosed on 7/2/2023 and again on 7/8/2023 being revived by Narcan on both occassions [sic], the latter by the Mount Vernon Police Department.

This writer consulted with Sheriff's office [mental health professional] . . . . There is no active [less restrictive alternative order (LRO)] as of this writing.

Ms. Sharp also noted her observations during her interview with A.V.

DCR arrived at 9:50 pm to introduce self and her role, the possible outcomes of the assessment and to read [A.V.] her rights. [A.V.] was unable or unwilling to communicate with the DCR. It is not clear that [A.V.] understood her rights as she was curled up in a fetal position, with a blanked [sic] wrapped tightly around her, with her back to the DCR, rocking back and forth in an attempt to self-sooth.

[A.V.]'s skin condition appeared bruised on her arms and face. She was not able to speak or hold eye contact with the DCR.

One hour prior to the DCR's arrival, the med tech's [sic] told this writer that [A.V.] was talking, asking when the DCR would arrive and made a phone call to her mother, asking to be picked up. There were no medications provided to [A.V.] prior to the DCR arrival. It is unclear if [A.V.] is gravely disabled or just refusing to engage.

Ms. Sharp further noted that her review of "researched history in the Compass Medical Chart, previous [less restrictive alternative order], and lack of involvement in the [Program of Assertive Community Treatment (PACT)] indicates [A.V.] is gravely disabled and requires hospitalization to treat the dual diagnosis." Ms. Sharp also noted that A.V.'s "[c]urrent physician was not available to consult due to the busy nature of the ER on this evening."

3

Given all of this, Ms. Sharp recommended that A.V. "be detained at an evaluation and treatment facility or secure detox facility for no more than 120 hours (excluding Saturday, Sunday and legal holidays) for evaluation and treatment."

On July 31, 2023, two members of the staff at North Sound Telecare Evaluation and Treatment Center filed a 14-day involuntary treatment petition in Skagit County Superior Court.

On August 1, 2023, the trial court held a hearing on the 14-day involuntary commitment petition. At the beginning of the hearing, A.V.'s counsel moved to dismiss the petition, arguing that the designated crisis responder's evaluation of A.V. did not reflect that she had spoken with or reviewed the notes of A.V.'s examining emergency room physician prior to finalizing her evaluation of A.V. on the night in question. The State responded that Ms. Sharp's testimony would reflect that she attempted to speak with the physician in question and, furthermore, that she had consulted A.V.'s medical records. The court reserved its ruling until after Ms. Sharp testified. Her testimony began shortly thereafter.

On direct examination, Ms. Sharp testified that she had reviewed A.V.'s chart before evaluating A.V. in person. The State then elicited the following:

> Q. Did you attempt to consult with the attending physician?
> A. You know, I did. I actually went to the -- the charge nurse's desk and asked for the doctor and I was told, he's not here. There were people all over the hallways and into the -- the anterooms and in the waiting room where they were setting up triage, and I just assumed he was working and couldn't be interrupted.
> So I did ask for him, but he was not available.

4

Q. And it seemed like a particularly busy night at the emergency room?

A. Yes. Yes, it was quite busy.

Q. And you stated earlier that you consulted her chart. What chart was that?

A. The clinical information that was sent to me. We always have the clinicals, who cleared her medically, what her tox[icology] screen showed, you know, all -- all of the pertinent information that is going to tell me that she is medically cleared.

Q. And that was provided to you by the hospital. So those were medical records?

A. Yes.

Q. Did you also consult the Compass medical records within your own --

A. Yes.

Q. -- agency?

A. I did. Yes, absolutely. We have two (unintelligible; interference) check in our own medical records called Credible and Docuware. And again, I can go look at any previous hospitalizations and clinical information to help me historically put together, you know, a history to support or not support a detention.

On cross-examination, Ms. Sharp testified that, when she is tasked with determining whether an individual should be involuntarily committed, it is her preferred protocol to "do my investigation prior to having my assessment with a particular client." She further testified that, prior to assessing A.V., she "had already consulted with the clinical paperwork." A.V.'s counsel then elicited the following testimony:

Q. Okay. The paperwork that you mentioned, who authored that?

A. I am the author of all of the paperwork.

Q. Oh. That's --

A. The custody, the --

Q. That's not what I'm referring to. The paperwork that you -- from the hospital that you referred to.

A. Oh, okay. The clinical information is authored by the charge nurses, by the -- by the -- all the nurses who have interaction with the individual.

Q. Okay.

5

A.  The lab results, the attending physician, if -- if he or she had left specific comments about the individual.

Q.  Do you recall if that attending physician had left comments about [A.V.]?

A.  I do not recall.

After A.V.'s counsel finished Ms. Sharp's cross-examination, the trial court inquired with Ms. Sharp as follows:

> THE COURT: So I'm still trying to clarify this.  So, Ms. Sharp, if I've got this correct.  And this is follow-up of [A.V.'s counsel's] questions.  So prior to going to meeting [A.V.], you reviewed Compass Health's records.  You looked at lab reports.  *If there was any other information from the hospital that was available from that particular night, you reviewed that.*  You reviewed affidavits from -- I think there was some affidavits from police officers and some things like that.
> *MS. SHARP:  Yes.*
> *THE COURT:  You did all of that prior to going to meet [A.V.]. Is that correct?*
> *MS. SHARP:  Yes.*

(Emphasis added.)

The trial court later issued a ruling on A.V.'s motion to dismiss, finding that

> [i]n this, there is the testimony of Ms. Sharp that she -- the physician was not available.  She described the situation in the ER, why the physician was not available because of it being so busy and patients being everywhere.  She requested to speak to the physician and was told the physician -- he is not here, is what they -- she was told when she asked to speak to the physician.
> What is clear is that she said that prior to meeting with [A.V.], she consulted physician's notes, if there was any comments left, but she doesn't recollect if there are any comments left, and there is no information on her statement whether she actually looked at comments or didn't look at comments.  She just said that that was her ordinary practice, though.
> . . . .
> [S]he did specifically say that that is what her practice is, that she reviews the charts, she reviews the information and documentation that is available at the hospital prior to going to meeting with the patient.  And so based on that . . . I'm not granting your motion to dismiss at this time.
> . . . .

[I]t appears that Ms. Sharp . . . based on her historical practice in doing this, and also based on this particular case . . . states that she reviewed different documents. The Compass records, the records that she was aware of, the hospital records that were available to her, she attempted to speak directly to the [ER] physician [who] was not available at that particular time.

There's a statement in her report that states that the physician was not available, and there's the statement based on the research history in the Compass medical chart[,] [previous less restrictive alternative order,] and lack of involvement in fact.

The court also found that Ms. Sharp

couldn't remember the name of the particular person or people there at that point in time. There's been a lot of other people and cases that she's had in the interim. She specifically told us she didn't have her notes or -- and she did not review her notes for this particular case prior to testifying.

The court also determined that "the fact that [Ms. Sharp] couldn't remember the name of the particular person whose information she reviewed at the time of assessing [A.V.] is not a reason to then dismiss this."

The trial court concluded that the initial detention petition satisfied the requirements of RCW 71.05.154 and, thereafter, denied A.V.'s motion to dismiss the 14-day involuntary commitment petition and entered an order granting the petition.

A.V. now appeals.[3]

II

A.V. asserts that the trial court erred by denying her motion to dismiss and by granting the State's 14-day involuntary commitment petition. The trial court erred, A.V. contends, because she had been initially detained without lawful

---

[3] After A.V.'s appeal was submitted, a petition for a 90-day commitment for involuntary treatment was submitted, which the superior court granted.

authority when, according to A.V., the designated crisis responder totally disregarded pertinent requirements of the ITA when petitioning for A.V.'s initial detention. We disagree.

A

The meaning of the provisions of the ITA is a question of law that we review de novo. In re Det. of C.A.C., 6 Wn. App. 2d 231, 234, 430 P.3d 276 (2018) (citing State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009)). We review for abuse of discretion whether a trial court properly applied the law to the facts in question. In re Det. of A.C., 1 Wn.3d 731, 739, 533 P.3d 81 (2023).

In 2015, our state legislature amended the ITA to mandate, in pertinent part, that

> [w]hen construing the requirements of this chapter the court must focus on the merits of the petition, *except where requirements have been totally disregarded*, as provided in In re[ Det. of] C.W., 147 Wn.2d 259, 281[, 53 P.3d 979] (2002). A presumption in favor of deciding petitions on their merits furthers both public and private interests because the mental and physical well-being of individuals as well as public safety may be implicated by the decision to release an individual and discontinue his or her treatment.

RCW 71.05.010(2) (emphasis added).

As applicable here, our Supreme Court later recognized that the legislature had not defined "totally" or "disregarded" in the ITA. A.C., 1 Wn.3d at 744 (citing RCW 71.05.020).[4] The court, for its part, interpreted those terms as follows:

---

[4] On July 27, 2023, Our Supreme Court issued its decision in A.C. 1 Wn.3d 731. Later that day, on the evening of July 27, Ms. Sharp conducted her in-person evaluation of A.V. The next day, on July 28, Ms. Sharp filed the initial detention petition at issue in this matter.

"Totally" is defined in *Merriam-Webster* as "in a total manner : to a total or complete degree." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/totally (last visited June 16, 2023). "Disregard" is defined as "to pay no attention to : treat as unworthy of regard or notice" and as "the act of treating someone or something as unworthy of regard or notice : the state of being disregarded." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam webster.com/dictionary/disregard (last visited June 16, 2023). In the admittedly very different context of negligent homicide, we observed that

> disregard . . . implies an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term "negligence." Every violation of a positive statute, from a defective taillight to an inaudible horn may constitute negligence under the motor vehicle statutes, yet be unintentional, committed without knowledge, and amount to no more than oversight or inadvertence but would probably not sustain a conviction of negligent homicide. To drive with disregard for the safety of others, consequently, is a greater and more marked dereliction than ordinary negligence. It does not include the many minor inadvertences and oversights which might well be deemed ordinary negligence under the statutes.

State v. Eike, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967).

A.C., 1 Wn.3d at 744-45.

The high court instructed that "the requirements of the ITA have been totally disregarded when a person is involuntarily detained without legal authority under the act." A.C., 1 Wn.3d at 745. However, the court further instructed, "[t]he requirements of the ITA are not totally disregarded in every case where some aspect of the act has been violated." A.C., 1 Wn.3d at 745. Indeed,

> not every violation of the ITA necessitates dismissal. "The [legislative] goals of ensuring continuity of care and protecting the public are decidedly not met if dismissal of properly filed and factually supported petitions turns on [things other] than on the court's determination of whether or not legal grounds for

9

> commitment exist." [In re Det. of Swanson, 115 Wn.2d 21,] 29[, 804 P.2d 1 (1990)]. Accordingly, "[u]nderlying the involuntary treatment act is a tacit presumption in favor of deciding issues on the merits." [In re Det. of ]G.V., 124 Wn.2d[ 288,] 296[, 877 P.2d 680 (1994)].

A.C., 1 Wn.3d at 741 (some alterations in original).

B

Here, the statutory provision that A.V. alleges was totally disregarded by the designated crisis responder in this matter reads as follows:

> **Detention of persons with behavioral health disorders— Evaluation—Consultation with emergency room physician.** If a person subject to evaluation under RCW 71.05.150 or 71.05.153 is located in an emergency room at the time of evaluation, the designated crisis responder conducting the evaluation shall take serious consideration of observations and opinions by an examining emergency room physician, advanced registered nurse practitioner, or physician assistant in determining whether detention under this chapter is appropriate. The designated crisis responder must document his or her consultation with this professional, if the professional is available, or his or her review of the professional's written observations or opinions regarding whether detention of the person is appropriate.

RCW 71.05.154.

The record does not reflect that the designated crisis responder totally disregarded the foregoing provision. As an initial matter, Ms. Sharp documented that she had attempted to speak with A.V.'s examining emergency room physician on the night in question. This reflects that she had sought to follow the requirements of the act but was unsuccessful due to the unavailability of the physician in question in light of the busy circumstances of the emergency department on the night of July 27.

Furthermore, it is undisputed that Ms. Sharp gave serious consideration to any available medical records that were relevant to her initial detention recommendation concerning A.V., including that of the emergency room physician charged with A.V.'s care.  Ms. Sharp's undisputed testimony reflects that she has a protocol of reviewing available records—including medical and police records—prior to conducting an in-person interview.  Significantly, she testified that, prior to conducting such an interview with A.V., she had reviewed all available hospital records associated with A.V, including the hospital records from the night in question: the chart notes from the emergency physician assigned to A.V.'s care, the chart notes from A.V.'s charge nurses, and A.V.'s laboratory test results.

Moreover, although Ms. Sharp's petition does not expressly document that she reviewed the medical notes from the emergency physician's examination, her petition does expressly document that she reviewed the results from A.V.'s toxicology screening which was obtained in the hospital on the night in question. Given Ms. Sharp's standard evaluation protocol, this suggests that Ms. Sharp had reviewed A.V.'s hospital records from the night in question, which would have logically also included a review of any other available medical records, including the examination notes of A.V.'s emergency room physician from July 27.[5]

---

[5] Ms. Sharp's testimony also reflects that, consistent with her standard evaluation protocol, she reviewed other records pertinent to the appropriateness of A.V.'s initial detention. Indeed, she testified that she had previously reviewed A.V.'s medical records with another treatment provider, Compass Health, which included A.V.'s prior hospitalizations and clinical information as well as police investigation records regarding A.V. and the existence of current or prior less restrictive treatment alternative orders entered against her.

11

In addition, although Ms. Sharp testified that she did not recall the content of the emergency physician's examination notes, she also testified that she did not have an opportunity to review those notes prior to her testimony in this matter. This does not, by itself, establish that Ms. Sharp had not reviewed the emergency physician's notes regarding A.V. prior to her in-person evaluation, nor does A.V. present us with evidence to the contrary. Indeed, the fact that Ms. Sharp has a standard protocol which includes reviewing hospital records, that she asked to speak with the examining emergency room physician, and that she expressly referenced information located in A.V.'s hospital records from the night in question suggests that Ms. Sharp considered any examining physician's notes when making her determination as to the appropriateness of A.V.'s detention. Accordingly, the record reflects that Ms. Sharp, the designated crisis responder, did not totally disregard the protections of the ITA in evaluating A.V. for an initial detention.[6]

C

A.V. nevertheless relies on a decision of Division Two of this court, In re Det. of K.R., 195 Wn. App. 843, 381 P.3d 158 (2016), for the proposition that the foregoing documentation provision in the ITA was totally disregarded by the

---

[6] A.V. contends that the absence of documentation by Ms. Sharp regarding the examining emergency room physician's written observations or opinions regarding whether detention of A.V. was appropriate is evidence of Ms. Sharp's violation of the provision at issue. However, the absence of documentation of such physician's written observations or opinions is also consistent with the absence of any such observations or opinions by the physician in question. Furthermore, A.V. neither presented us nor the trial court with evidence (such as the emergency room physician's examination notes from July 27) that the physician in question had significant written observations or opinions regarding the appropriateness of A.V.'s detention that Ms. Sharp could have documented but did not. Thus, A.V.'s contention fails.

designated crisis responder herein. Because the decision in K.R. was predicated on a version of the statutory provision that our legislature has since significantly amended, A.V.'s contention fails.

As an initial matter, the statutory provision in effect at the time of the appellate court's decision in K.R. reads as follows:

> A designated crisis responder conducting an evaluation of a person under RCW 71.05.150 or 71.05.153 must consult with any examining emergency room physician regarding the physician's observations and opinions relating to the person's condition, and whether, in the view of the physician, detention is appropriate. The designated crisis responder shall take serious consideration of observations and opinions by examining emergency room physicians in determining whether detention under this chapter is appropriate. *The designated crisis responder must document the consultation with an examining emergency room physician, including the physician's observations or opinions regarding whether detention of the person is appropriate.*

Former RCW 71.05.154 (2016) (emphasis added).

In K.R., Division Two concluded that the designated crisis responder therein totally disregarded the documentation requirement of the foregoing statutory provision. 195 Wn. App. at 847-48. This was so, the court determined, because there was "no evidence in the record indicating that the [designated crisis responder] consulted with any examining [emergency room] physician" as required by RCW 71.05.154. K.R., 195 Wn. App. at 847.

The following year, however, our legislature amended RCW 71.05.154 to read as follows:

> If a person subject to evaluation under RCW 71.05.150 or 71.05.153 is located in an emergency room at the time of evaluation, the designated crisis responder conducting the evaluation shall take serious consideration of observations and

13

> opinions by an examining emergency room physician, advanced registered nurse practitioner, or physician assistant in determining whether detention under this chapter is appropriate. *The designated crisis responder must document his or her consultation with this professional, if the professional is available, or his or her review of the professional's written observations or opinions regarding whether detention of the person is appropriate.*

RCW 71.05.154 (emphasis added).

The plain language of the amended provision reflects that the legislature intended to change the language such that a designated crisis responder would be provided with alternative documentation requirements. Indeed, the legislature not only added another manner in which the documentation requirement could be satisfied—documentation of review of certain written observations or opinions— but also separated that documentation requirement from the prior documentation requirement with an "or." It is thus plain that a designated crisis responder must *either* document that the responder consulted with a specified examining emergency medical professional regarding the individual in question *or*, in the alternative, document that the responder reviewed that medical professional's examination notes regarding that individual. RCW 71.05.154. Therefore, so long as the designated crisis responder documented either a qualifying medical professional consultation or having reviewed such professional's examination notes, the documentation requirement of the provision is satisfied.[7]

---

[7] At the trial court hearing in question, the parties did not dispute that the legislature intended for the foregoing provision to set forth alternative documentation requirements in order for a designated crisis responder to comply with that provision. Indeed, at the hearing in question, A.V.'s counsel stated that,

> just so the record is clear, I am not arguing that the [S]tate has -- that the DCR has to speak with the -- with the attending physician. It's -- it is -- the [S]tate is correct, it is an or. That's my reading as well, where they can -- they have to speak with either the emergency room physician[,] . . . the advanced registered nurse practitioner, or physician's assistant, and/or they can review their notes.

Given all of this, A.V.'s reliance on K.R. is unavailing. Division Two's decision in K.R. relied on a prior version of RCW 71.05.154 that only provided a single documentation requirement, which the designated crisis responder therein failed to comply with, thereby constituting a total disregard of that provision. Here, the statutory provision in effect at the time in question provides alternate documentation requirements and, as discussed herein, the record reflects that the designated crisis responder in this matter did not totally disregard either of those requirements. RCW 71.05.154. Therefore, because the versions of the statutory provision at issue in K.R. and in this matter are materially distinct, A.V.'s reliance on K.R. fails.[8]

Thus, the trial court did not err by denying A.V.'s motion to dismiss or by granting the petition to confine A.V. for a 14-day period of involuntary medical treatment. Accordingly, A.V. fails to establish an entitlement to appellate relief.

---

On appeal, A.V. now asserts that, in order to comply with the provision in question, a designated crisis responder must both document a consultation with a qualifying emergency room medical professional and document a review of such medical professional's examination notes. For the reasons provided, infra, and because the act does not put such onerous requirements on a designated crisis responder, A.V. is incorrect.

[8] A.V. also asserts that Ms. Sharp totally disregarded the act because the initial detention petition does not document that Ms. Sharp had inquired and consulted with other emergency medical professionals identified in the provision in question. However, as analyzed above, the provision in question requires *either* documentation of a consultation *or* documentation of having reviewed applicable emergency room examination records. See RCW 71.05.154. As discussed herein, the record here supports that Ms. Sharp attempted to consult with the examining emergency room physician regarding A.V. and that she reviewed that physician's notes concerning A.V. from the night in question prior to evaluating A.V. Given that, Ms. Sharp did not totally disregard the medical record documentation requirements of that provision.

Affirmed.

Deyn, J.

WE CONCUR:

Díaz, J.

Chung, J.